UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO.  03 CV 12307 RGS

JOSEPH CHRISTOFORO
    Plaintiff

VS.

JULIO LUPO, FRANK G. COUSINS, JR.,
INDIVIDUALLY AND IN HIS CAPACITY
AS ESSEX COUNTY SHERIFF, and
CERTAIN UNKNOWN INDIVIDUALS
    Defendants

## MOTION OF DEFENDANT JULIO LUPO
## FOR SUMMARY JUDGMENT

Now comes the Defendant, Julio Lupo, and moves for summary judgment

pursuant to Fed. Rule of Civ. Pro. Rule 56 with regard to Count I of the Plaintiff's

Amended Complaint.

As reasons therefor, there exist no genuine issues of material fact and the

Defendant is entitled to judgment as a matter of law.

In support hereof, the Defendant submits the attached Memorandum of Law and
Exhibits.  (Please note that to computer scanning problems, the Defendant will e-file the
Exhibits within the next two days).

Respectfully submitted,
DEFENDANT, JULIO LUPO
By his Attorney,

/s/ "Jay Hodapp"
Jay Hodapp/BBO #551348
Joseph W. Monahan, III/BBO #351000
MONAHAN & PADELLARO
43 Thorndike Street
Cambridge, MA   02141
617-494-1188

Dated June 20, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO.  03 CV 12307 RGS

JOSEPH CHRISTOFORO
Plaintiff

VS.

JULIO LUPO, FRANK G. COUSINS, JR.,
INDIVIDUALLY AND IN HIS CAPACITY
AS ESSEX COUNTY SHERIFF, and
CERTAIN UNKNOWN INDIVIDUALS
Defendants

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT
## JULIO LUPO FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

The Plaintiff, Joseph Christoforo, alleges that on December 23, 2002, while

serving a sentence of incarceration at the Essex County House of Correction, he was

struck by the Defendant, Julio Lupo, an Assistant Director of Food Services at the

facility, in violation of his civil rights as guaranteed by the United States Constitution, as

prohibited by 42 U.S.C. §1983 and §1988.

The gist of Count I of the Plaintiff's Amended Complaint appears to assert a

claim of excessive force in violation of the Eighth Amendment and resolution of that

claim should also settle any collateral claims or issues that may exist.[1]  Accordingly, this

---

[1]  The Defendant asserts that as to each and every of the other alleged causes of action contained in or
referred to by Count I of the Plaintiff's Complaint, there exists no genuine issues of material fact and that
the Defendant is entitled to judgment as a matter of law.

analysis will focus on the Plaintiff's claims in light of the protections afforded under the Eighth Amendment to the United States Constitution.

## STATEMENT OF UNDISPUTED FACTS

On December 23, 2002, Plaintiff, Joseph Christoforo (hereinafter "Christoforo"), was an inmate kitchen worker at the Essex County House of Correction. On that day, he was assigned to the service line, preparing food trays along with several other inmates. (Christoforo Deposition, Vol. II, pgs 4-5; attached as Defendant's Ex. I) The Defendant, Julio Lupo (hereinafter "Lupo") was the Assistant Director of Food Services on Christoforo's shift and was responsible for the orderly preparation of the meals. Lupo had supervisory authority over Christoforo and the other kitchen inmate workers. (Lupo Deposition, pg 18; attached as Defendant's Ex. II)

At one point, Lupo called out from across the kitchen for the line workers to be quiet. (Christoforo Deposition, Vol. II, pg 5; attached hereto as Ex. III) Thereafter, Lupo observed Christoforo engaged in boisterous and disruptive conversation with other inmates on the service line. Lupo approached Christoforo, ordered him to stop talking, and walked away. Christoforo resumed with his disruptive talking and Lupo once again walked over, and for the third time asked Christoforo and the other inmates to be quiet and get back to work. (Christoforo Deposition, Vol. II, pgs 6-7; Lupo Deposition, pgs. 32-34; attached hereto as Ex. IV) As he issued his directive, Lupo was standing behind Christoforo with his right hand resting on Christoforo's left shoulder. Lupo then remarked to Christoforo "and you stop egging them on" or words to that effect, and as he did, Lupo removed his right hand from Christoforo's left shoulder and brought it in

contact with Christoforo's left ear.[2]  Lupo then walked away and the inmates, including

Christoforo, returned to work without further incident. (Lupo Deposition, pgs 32-37,

Christoforo Deposition, Vol. II, pgs 5-8, Christoforo interview, pg 10; attached hereto as

Defendant's Ex. VIII)  Christoforo did not complain of any injury in his initial report of

the incident to Food Services Director Kathy Lawrence, nor did Ms. Lawrence observe or

note any visible signs of injury to Christoforo (Statement of Kathy Lawrence, Lawrence

Deposition, pgs 20-25; attached hereto as Defendant's Ex. IX)  Christoforo later

requested and was granted permission to visit the infirmary.  Christoforo presented at the

infirmary with complaints of dizziness and ringing in his left ear.  He also complained of

nausea and several unwitnessed episodes of vomiting.  A small lump was allegedly noted

behind his left ear.  On December 24, 2003, Christoforo reported that he was feeling

better and was cleared to return to population. (Medical Records of Essex County House

of Correction Medical Facility; attached hereto as Defendant's Ex. X)

   Christoforo later sought medical treatment at the Lemuel Shattuck Hospital and

New England Eye Center, Tufts University School of Medicine, complaining of migraine

headaches, left side hearing impairment, left eye impairment and left side face spasms.

Diagnostic studies, including a CT Scan and MRI were unremarkable.  Medical opinion

ruled out any causal relationship between the incident of December 23, 2002, and

Christoforo's left eye and left side face complaints.  (Lemuel Shattuck and Tufts

University Hospital medical records; attached hereto as Defendant's Ex. XI)  Christoforo

---

[2]  A disputed, though not material, question of fact exists as to the exact nature of the physical contact that
occurred between Lupo and Christoforo.  Lupo has always maintained that he lightly flicked Christoforo's
left earlobe with the back side of his open right hand. (Lupo Deposition, Vol. II, pgs 34-37); attached
hereto as Defendant's Ex. V)  Christoforo initially reported that he was slapped by Lupo (Incident Report
of Kathleen C. Lawrance, Director of Food Services: Deposition of Kathleen C. Lawrance, pgs. 4-6, 20-25;
attached hereto as Defendant's Ex. VI)  Christoforo now alleges that he was punched by Lupo. (Christoforo
Deposition at pg. 7; attached hereto as Defendant's Ex. VII)

did not seek any psychiatric treatment for any alleged emotional or psychological injuries. (Christoforo Deposition, Vol. II, pgs 112-113; attached hereto as Defendant's Ex. XII)

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

The role of summary judgment in civil litigation is to pierce the boilerplate of the pleadings and assay the parties proof in an effort to determine whether trial is actually required. *McIntosh vs. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995)(citing *Wynn vs. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992). A motion for summary judgment will be granted upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Hinchey vs. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir. 1998)(quoting Fed. R. Civ. P. 56(c). *Lehman vs. Prudential Ins. Co. of America*, 74 F.3d 323 (1st Cir. 1996).

Summary judgment shall be entered in favor of a moving party when the pleadings, affidavits and depositions establish there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Lehman vs. Prudential Ins. Co. of America,* 74 F.3d 323 (1st Cir. 1996); *Hope Furnace Associates, Inc. vs. F.D.I.C.*, 71 F.3d 39 (1st Cir. 1995). The Plaintiff cannot rely upon the allegations contained in his complaint to get beyond a motion for summary judgment. He must present evidence to counter that which the defendant presents and cannot rest upon the allegations in his pleadings. *Vargas vs. Royal Bank of Canada*, 604 F. Supp. 1036 (D.C. Puerto Rico 1985.)

## ARGUMENT

"Whenever a prison official stands accused of using excessive physical force constituting 'the unnecessary and wanton infliction of pain' violative of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley vs. Albers*, 475 U.S. 312, 320-321"; *Hudson vs. McMillian, et al*, 503 U.S. 1.  The central question is whether the physical force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. *Whitley*, 475 U.S. at 321.

Under *Whitley*, in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment to the United States Constitution, the courts will look to several factors including: 1) the need for the application of force; 2) the relationship between the need and the amount of force that was used; 3) the extent of injury inflicted; 4) the extent of the threat to the safety of the staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and 4) any efforts made to temper the severity of a forceful response. *Whitley*, *supra* at 321.

"An inmate's constitutional protection against excessive force is nowhere nearly so extensive as that afforded by the common law tort action for battery." *Hunt vs. Budd*, 895 F. Supp. 35, 38 (N.W.N.Y. 1995) (quoting *Johnson vs. Glick*, 481 F.2d 1028 (1973)). What constitutes such conduct varies according to the nature and circumstances of the alleged constitutional violation. *Whitley*, *supra* at 312, 320.  "The question whether the measures taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id*. at 320-21. (quoting *Johnson vs. Glick*, *supra*.))  "Whether the prison disturbance is a riot or lesser

disturbance, correction officers must balance the need to 'maintain or restore discipline' through force against the risk of injury to inmates." *Hudson* at 996.

The Eighth Amendment prohibition against civil and unusual punishment necessarily excludes from recognition de minimus uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." *Hudson*, 112 S. Ct. at 1000 (quoting *Whitley*, 475 U.S. at 327). The absence of serious injury, though not singularly determinative, is nevertheless relevant. *Id*. at 1000. Accordingly, "not every punch or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's rights."

Applying *Whitley* and its progeny to the facts of the instant case, it is clear that on the date of the alleged incident, there existed a reasonably perceived need for the application of some degree of force.

Prior to the use of any physical force, Christoforo was engaging in unruly and disruptive behavior. Moreover, Christoforo's conduct was having an immediate and disruptive effect on several other inmates. (Defendant's Ex. VIII). Christoforo had been verbally warned two times before the application of any force to remain quiet and return to work. (Defendant's Ex. VIII) All reasonable efforts to avoid the use of physical reinforcement were frustrated by Christoforo's repeated refusal to obey Lupo's directives. The amount of physical force ultimately employed, whether a slap, punch, or mere flick of the hand (please see Footnote 1), amounted to a single instance of physical contact – hardly the type of conduct that might be viewed as "repugnant to the conscience of mankind." *Hudson*, *supra*. In point of fact, the degree of force used was clearly de minimus as evidenced by the de minimus nature of Christoforo's alleged injuries.

(Defendant's Exs. IX, X and XI)  Moreover, Lupo's de minimus use of physical force achieved its desired effect of restoring order and avoiding the escalation of disharmony among the inmates.

## CONCLUSION

The Defendant submits that in light of the undisputed facts and circumstances described above, no person could reasonably conclude that the Defendant, Julio Lupo, violated any rights of the Plaintiff, Joseph Christoforo, as guaranteed by the United States Constitution.

WHEREFORE, the Defendant, Julio Lupo, is entitled to judgment as a matter of law on Count I of the Plaintiff's Complaint.

Respectfully submitted,
DEFENDANT, JULIO LUPO

By his Attorney,


/s/"Jay Hodapp"
Jay Hodapp/BBO #551348
Joseph W. Monahan, III/BBO #351000
MONAHAN & PADELLARO
43 Thorndike Street
Cambridge, MA   02141
617-494-1188

Dated: June 20, 2005

7

# EXHIBIT I

ORIGINAL

1          UNITED STATES DISTRIC COURT

2           DISTRICT OF MASSACHUSETTS

3              NO. 03 CV 12307 RGS

4     - - - - - - - - - - - - - - - - - - -
                                          -
5    JOSEPH CHRISTOFORO,                  -
            Plaintiff                     -
6                                         -
        -VS-                              -
7                                         -
     JULIO LUPO, FRANK G. COUSINS,        -
8    JR., INDIVIDUALLY AND IN HIS         -
     CAPACITY AS ESSEX COUNTY SHERIFF,    -
9    and CERTAIN UNKNOWN INDIVIDUALS,     -
            Defendants                    -
10    - - - - - - - - - - - - - - - - - - -

11

12

13          DEPOSITION OF JOSEPH CHRISTOFORO

14               Volume II

15

16          Deposition taken at the law offices

17   of  Merrick, Louison & Costello, 67 Batterymarch

18   Street, Boston, Massachusetts, on Thursday,

19   May 19, 2005, commencing at 10:20 a.m.

20

21

22

23       DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
      ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
24                 617-742-6900

```
1                    P-R-O-C-E-E-D-I-N-G-S
2                    JOSEPH CHRISTOFORO
3           having been previously duly sworn, was deposed
4      and testified as follows:
5                    E-X-A-M-I-N-A-T-I-O-N
6      BY MR. HODAPP:
7   Q   This is the resumption of a deposition begun on
8       Monday, May 16th.  Good morning, Mr. Christoforo.
9   A   Good morning.
10  Q   Could you please describe the events of December
11      23, 2002.
12  A   Sure.  I went to work that morning as, you know,
13      and I had a different job that morning.  And I was
14      performing my work detail.  Would you like me to
15      start in the morning?
16  Q   Please.
17  A   And while I was performing one of my new duties
18      for that morning, Julio had come into work, was
19      talking to big Paul -- I don't know his last
20      name -- about something.  I didn't hear what they
21      were talking about; but he did glance over and
22      look at me after they had finished their
23      conversation.
24           And when they were done, I was still doing my
```

1    work.  We were on a serving line preparing the

2    food for the inmates.  And there is

3    approximately -- there is at that time I believe

4    there's nine people on the line.  I was sitting

5    on -- say this is the table where the food is

6    coming down, I was sitting here, there was a

7    gentleman to my left, a gentleman to my right.

8    And we were talking and doing our job.

9        And then the kid across -- there was a

10    gentleman across from me, which I don't recall his

11    name, but he was wondering why he couldn't take a

12    cooking job in place of my job, which I was

13    cooking.  I was the head cook at the time but not

14    at this point.  I talked to Paul, and he had given

15    me a new position.

16        And the kid was talking to the group of us

17    wondering why he couldn't have a new job.  And he

18    was saying something like he thought he might not

19    be able to get the job because a racial thing

20    because he was black or something.  He was

21    wondering why they weren't allowing him to do

22    something better than he was doing.

23        Julio was in the background, he yelled out why

24    don't you keep your mouth shut, not talking to

1   anyone in particular, I can hear you all the way

2   back here he stated.  So he wasn't talking to me

3   or anybody else, he yelled that out.  I guess he

4   might have heard the gentleman talking, he heard

5   the gentleman talking; so we continued to put the

6   food on the trays.

7      I think on that day I was putting Granola bars

8   on the tray.  And he had come over, and he had put

9   his arm on my shoulder and said, again, you know,

10   I want you guys to keep your mouths shut down

11   here, you know, I can hear you all the way around

12   there across the way.

13      And I believe he called the gentleman

14   across -- he called the gentleman across a

15   melongena he had said, so I believe Mr. Roberts

16   was his last name, I forget his first name though;

17   and he walked away.

18      One of the kids had asked and I believe I had

19   asked at the time what is a melongena.  I didn't

20   know what it meant.  And Ralph Sordillo had

21   mentioned a melongena is an eggplant, being slang.

22   I didn't know what that meant.

23      At that point Julio come back, put -- he

24   stepped behind me and had said get back to fucking

# EXHIBIT II

```
 1                                    Volume I
                                      Pages 1 to 91
 2                                    Exhibits 1 to 8

 3              UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       JOSEPH CHRISTOFORO,
 6                      Plaintiff(s),

 7          v.                          Civil Action
                                        No. 03 CV 12307 RGS
 8     JULIO LUPO, FRANK G. COUSINS, JR.,
       INDIVIDUALLY AND IN HIS CAPACITY AS
 9     ESSEX COUNTY SHERIFF, AND CERTAIN
       UNKNOWN INDIVIDUALS,
10                      Defendant(s).

11     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12

13          DEPOSITION OF JULIUS J. LUPO, a witness called by

14     counsel for the Plaintiff, taken pursuant to the

15     applicable rules, before Diane L. McElwee, Registered

16     Merit Reporter and Notary Public in and for the

17     Commonwealth of Massachusetts, at the Offices of

18     GILMORE, REES, CARLSON & CATALDO, P.C, 1000 Franklin

19     Village Drive, Franklin, Massachusetts, on Monday,

20     May 16, 2005, commencing at 2:35 PM.

21                           _____

22

23              DIANE L. McELWEE, RPR, RMR

24
```

A     Working for the jail, not for me individually.

Q     But he reported to you in his capacity as cook, correct?

A     No.

Q     Who did he report to?

A     The other correctional cooks there.

Q     Did you oversee the correctional cooks?

A     Yes.

Q     So you oversaw Mr. Cristoforo's work?

A     Yes.

Q     What type of work was Mr. Cristoforo doing that you oversaw?

A     He would prepare the meal for the inmates.

Q     Anything else?

A     No.

Q     How was food delivered to the Essex County House of Correction in the year 2002?

A     Meaning?

Q     There would be deliveries by trucks of food I take it to the jail?

A     Yes.

Q     And did you have any responsibility as assistant food director in 2002 for the inventorying

# EXHIBIT III

ORIGINAL

1      UNITED STATES DISTRIC COURT

2      DISTRICT OF MASSACHUSETTS

3        NO. 03 CV 12307 RGS

4    - - - - - - - - - - - - - - - - - - - -
                                          -
5    JOSEPH CHRISTOFORO,                  -
            Plaintiff                     -
6                                         -
      -VS-                                -
7                                         -
     JULIO LUPO, FRANK G. COUSINS,        -
8    JR., INDIVIDUALLY AND IN HIS         -
     CAPACITY AS ESSEX COUNTY SHERIFF,    -
9    and CERTAIN UNKNOWN INDIVIDUALS,     -
            Defendants                    -
10                                        -
     - - - - - - - - - - - - - - - - - - - -
11

12

13        DEPOSITION OF JOSEPH CHRISTOFORO

14             Volume II

15

16        Deposition taken at the law offices

17   of  Merrick, Louison & Costello, 67 Batterymarch

18   Street, Boston, Massachusetts, on Thursday,

19   May 19, 2005, commencing at 10:20 a.m.

20

21

22

23        DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
          ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
24                   617-742-6900

1    work.  We were on a serving line preparing the

2    food for the inmates.  And there is

3    approximately -- there is at that time I believe

4    there's nine people on the line.  I was sitting

5    on -- say this is the table where the food is

6    coming down, I was sitting here, there was a

7    gentleman to my left, a gentleman to my right.

8    And we were talking and doing our job.

9         And then the kid across -- there was a

10   gentleman across from me, which I don't recall his

11   name, but he was wondering why he couldn't take a

12   cooking job in place of my job, which I was

13   cooking.  I was the head cook at the time but not

14   at this point.  I talked to Paul, and he had given

15   me a new position.

16        And the kid was talking to the group of us

17   wondering why he couldn't have a new job.  And he

18   was saying something like he thought he might not

19   be able to get the job because a racial thing

20   because he was black or something.  He was

21   wondering why they weren't allowing him to do

22   something better than he was doing.

23        Julio was in the background, he yelled out why

24   don't you keep your mouth shut, not talking to

# EXHIBIT IV

1

## ORIGINAL

1           UNITED STATES DISTRIC COURT

2           DISTRICT OF MASSACHUSETTS

3               NO. 03 CV 12307 RGS

4    - - - - - - - - - - - - - - - - - - -
                                          -
5    JOSEPH CHRISTOFORO,                  -
            Plaintiff                     -
6                                         -
        -VS-                              -
7                                         -
     JULIO LUPO, FRANK G. COUSINS,        -
8    JR., INDIVIDUALLY AND IN HIS         -
     CAPACITY AS ESSEX COUNTY SHERIFF,    -
9    and CERTAIN UNKNOWN INDIVIDUALS,     -
            Defendants                    -
10                                        -
     - - - - - - - - - - - - - - - - - - -

11

12

13         DEPOSITION OF JOSEPH CHRISTOFORO

14               Volume II

15

16         Deposition taken at the law offices

17    of  Merrick, Louison & Costello, 67 Batterymarch

18    Street, Boston, Massachusetts, on Thursday,

19    May 19, 2005, commencing at 10:20 a.m.

20

21

22

23      DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
       ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
24                   617-742-6900

6

1    anyone in particular, I can hear you all the way

2    back here he stated.  So he wasn't talking to me

3    or anybody else, he yelled that out.  I guess he

4    might have heard the gentleman talking, he heard

5    the gentleman talking; so we continued to put the

6    food on the trays.

7        I think on that day I was putting Granola bars

8    on the tray.  And he had come over, and he had put

9    his arm on my shoulder and said, again, you know,

10   I want you guys to keep your mouths shut down

11   here, you know, I can hear you all the way around

12   there across the way.

13       And I believe he called the gentleman

14   across -- he called the gentleman across a

15   melongena he had said, so I believe Mr. Roberts

16   was his last name, I forget his first name though;

17   and he walked away.

18       One of the kids had asked and I believe I had

19   asked at the time what is a melongena.  I didn't

20   know what it meant.  And Ralph Sordillo had

21   mentioned a melongena is an eggplant, being slang.

22   I didn't know what that meant.

23       At that point Julio come back, put -- he

24   stepped behind me and had said get back to fucking

7

| | | |
|---|---|---|
| 1 | | work and keep your mouth shut; and that's -- he |
| 2 | | punched me in the side of the head thinking I had |
| 3 | | said something about a melongena or he heard that |
| 4 | | word and punched me in the back of the head. |
| 5 | Q | You say that Julio thought that you had said -- |
| 6 | A | I don't know. |
| 7 | Q | -- to Smith -- |
| 8 | A | He heard -- |
| 9 | Q | Please, please.  You said that Julio thought you |
| 10 | | were the one who told Smith what a melongena is, |
| 11 | | what do you base that on? |
| 12 | A | I don't base it on anything.  What I said is he |
| 13 | | heard someone say it and he -- well, he just heard |
| 14 | | someone say it, he came over, was standing behind |
| 15 | | me; and that's when he whacked me in the back of |
| 16 | | the head. |
| 17 | Q | How do you know he heard someone say it? |
| 18 | A | Because he told us to shut the fuck up and get |
| 19 | | back to work. |
| 20 | Q | Did he use the word "melongena"? |
| 21 | A | Did he say that? |
| 22 | Q | When he came back to you, did he use the word |
| 23 | | "melongena"? |
| 24 | A | No, no. |

1                                      Volume I
                                       Pages 1 to 91
2                                      Exhibits 1 to 9

3                 UNITED STATES DISTRICT COURT

4                  DISTRICT OF MASSACHUSETTS

5      - - - - - - - - - - - - - - - - - -
       JOSEPH CHRISTOFORO,
6                     Plaintiff(s),

7           v.                               Civil Action
                                             No. 03 CV 12307 RGS
8      JULIO LUPO, FRANK G. COUSINS, JR.,
       INDIVIDUALLY AND IN HIS CAPACITY AS
9      ESSEX COUNTY SHERIFF, AND CERTAIN
       UNKNOWN INDIVIDUALS,
10                    Defendant(s).

11     - - - - - - - - - - - - - - - - - -

12

13          DEPOSITION OF JULIUS J. LUPO, a witness called by

14     counsel for the Plaintiff, taken pursuant to the

15     applicable rules, before Diane L. McElwee, Registered

16     Merit Reporter and Notary Public in and for the

17     Commonwealth of Massachusetts, at the Offices of

18     GILMORE, REES, CARLSON & CATALDO, P.C, 1000 Franklin

19     Village Drive, Franklin, Massachusetts, on Monday,

20     May 16, 2005, commencing at 2:35 PM.

21                        _____

22

23                 DIANE L. McELWEE, RPR, RMR

24

32

```
 1        Q     Ever use a rifle?

 2        A     No.

 3        Q     Ever use any means of self-defense that you

 4   were taught?

 5        A     No.

 6        Q     Did you ever strike an inmate?

 7        A     Yes.

 8        Q     When was the first time you struck an inmate

 9   at the Essex County House of Correction?

10        A     December 23d, Joseph Cristoforo.

11        Q     Tell us about that incident.  What happened

12   that caused you to strike Mr. Cristoforo on or about

13   December 23, 2002?

14        A     They were doing the meals.

15        Q     When you say "they," who do you mean?

16        A     The inmates were setting up the trays for

17   lunch feeding.  Inmate Cristoforo was causing a

18   disturbance in the line to slow the production down.

19        Q     What was he doing?

20        A     Talking between all the inmates, causing

21   problems.

22        Q     What problems was he causing?

23        A     Just work problems, work-related problems.

24        Q     Like what?
```

1       A    Like stopping the inmates from working up to

2  par.

3       Q    Did he physically stop anyone from working

4  up to par?

5       A    No.

6       Q    So he did this, in your opinion, simply by

7  speaking?

8       A    Speaking.

9       Q    What was he doing?

10      A    Swearing.

11      Q    What was he saying other than swearing?

12      A    I don't recall.

13      Q    What specific words, if any, do you recall

14  him saying?

15      A    That this place sucks; we don't have to do

16  this work.

17      Q    Anything else?

18      A    That's all.

19      Q    How many times did he say that?

20      A    I don't remember.

21      Q    More than one?

22      A    No, probably once, maybe twice.  After the

23  first time I went to tell him to be quiet, and then

24  when I went back, then they started again.  They

# EXHIBIT V

1

1        Volume I
         Pages 1 to 91
2        Exhibits 1 to 8

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
     JOSEPH CHRISTOFORO,
6              Plaintiff(s),

7        v.                    Civil Action
                               No. 03 CV 12307 RGS
8    JULIO LUPO, FRANK G. COUSINS, JR.,
     INDIVIDUALLY AND IN HIS CAPACITY AS
9    ESSEX COUNTY SHERIFF, AND CERTAIN
     UNKNOWN INDIVIDUALS,
10             Defendant(s).

11   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12

13       DEPOSITION OF JULIUS J. LUPO, a witness called by

14   counsel for the Plaintiff, taken pursuant to the

15   applicable rules, before Diane L. McElwee, Registered

16   Merit Reporter and Notary Public in and for the

17   Commonwealth of Massachusetts, at the Offices of

18   GILMORE, REES, CARLSON & CATALDO, P.C, 1000 Franklin

19   Village Drive, Franklin, Massachusetts, on Monday,

20   May 16, 2005, commencing at 2:35 PM.

21              _____

22

23       DIANE L. McELWEE, RPR, RMR

24

```
 1        Q    Ever use a rifle?

 2        A    No.

 3        Q    Ever use any means of self-defense that you

 4   were taught?

 5        A    No.

 6        Q    Did you ever strike an inmate?

 7        A    Yes.

 8        Q    When was the first time you struck an inmate

 9   at the Essex County House of Correction?

10        A    December 23d, Joseph Cristoforo.

11        Q    Tell us about that incident.  What happened

12   that caused you to strike Mr. Cristoforo on or about

13   December 23, 2002?

14        A    They were doing the meals.

15        Q    When you say "they," who do you mean?

16        A    The inmates were setting up the trays for

17   lunch feeding.  Inmate Cristoforo was causing a

18   disturbance in the line to slow the production down.

19        Q    What was he doing?

20        A    Talking between all the inmates, causing

21   problems.

22        Q    What problems was he causing?

23        A    Just work problems, work-related problems.

24        Q    Like what?
```

1     A     Like stopping the inmates from working up to

2   par.

3     Q     Did he physically stop anyone from working

4   up to par?

5     A     No.

6     Q     So he did this, in your opinion, simply by

7   speaking?

8     A     Speaking.

9     Q     What was he doing?

10    A     Swearing.

11    Q     What was he saying other than swearing?

12    A     I don't recall.

13    Q     What specific words, if any, do you recall

14  him saying?

15    A     That this place sucks; we don't have to do

16  this work.

17    Q     Anything else?

18    A     That's all.

19    Q     How many times did he say that?

20    A     I don't remember.

21    Q     More than one?

22    A     No, probably once, maybe twice.  After the

23  first time I went to tell him to be quiet, and then

24  when I went back, then they started again.  They

34

1    started banging.

2        Q    You heard him say, This place sucks; we

3    don't have to do this, words to that effect?

4        A    Something like that.

5        Q    You are not sure what the words were?

6        A    Right.

7        Q    What did you do when you heard that?

8        A    I went over and told him to keep the noise

9    down and keep the line moving.

10       Q    What did he say to you?

11       A    He said something, and I turned my back.

12       Q    Then what?

13       A    He said, Fuck him.

14       Q    Then what did you do then?

15       A    I went back to my table, and when the noise

16   started up again, I went to Cristoforo and flicked

17   his ear and told him to be quiet.

18       Q    When you flicked his ear, as you put it, was

19   he facing away from you?

20       A    No.  He was looking straight ahead.

21       Q    You came at him from the side?

22       A    Yes.

23       Q    He wasn't looking at you when you touched

24   him?

```
 1        A     No.

 2        Q     When you say "flicked his ear," what hand

 3   did you use?

 4        A     My right hand.

 5        Q     Was it open or closed?

 6        A     It was a back flip (indicating).

 7        Q     You made a gesture.  You struck him with the

 8   back part --

 9        A     -- back part of my hand.

10        Q     It was an open hand?

11        A     Open hand.

12        Q     Where on Mr. Cristoforo's body did you

13   strike him?

14        A     His earlobe.

15        Q     His earlobe?

16        A     Yes.

17        Q     Did you touch his neck?

18        A     No.

19        Q     So you gave a backhand and only touched his

20   earlobe?

21        A     No, not a backhand.  I flicked him, a flip.

22        Q     How far away from him when you first

23   initiated --

24        A     Right beside him.
```

1        Q      How far away?

2        A      Not even two inches.

3        Q      He hadn't turned to look at you?

4        A      No.

5        Q      So you were two inches -- you came up upon

6   him two inches away, and he hadn't turned to look at

7   you?

8        A      Right.

9        Q      And you flipped the back part of your hand

10  and hit just his earlobe?

11       A      Just his earlobe.

12       Q      No other part of his body?

13       A      No.

14       Q      You are sure?

15       A      Yes.

16       Q      What did he do?

17       A      Just continued working.

18       Q      Didn't make any reaction at all?

19       A      No.

20       Q      You hit his earlobe, and he didn't bat an

21  eyelash?

22       A      No.

23       Q      Didn't turn to you and say, What do you

24  want?

```
 1      A     I told him to be quiet.

 2      Q     What did he say to you?

 3      A     After that they just kept on working.

 4      Q     Did he say anything to you?

 5      A     No.

 6      Q     Did he make any reaction to you?

 7      A     No.

 8      Q     Did he put his hand to his ear like he had

 9   been hit?

10      A     No.

11      Q     Made no reaction at all?

12      A     No reaction at all.

13      Q     He made no reaction at all, is that your

14   testimony?

15      A     Yes.

16      Q     What did you do then?

17      A     I went to the store.

18      Q     What store?

19      A     A supermarket.

20      Q     You left work?

21      A     Yes.

22      Q     Immediately after striking Mr. Cristoforo

23   and telling him to keep working, keep quiet, what did

24   you do?
```

# EXHIBIT VI

# Essex County Correctional Facility
## & Sheriffs Headquarters
# INCIDENT REPORT
### (PLEASE PRINT and fill in all information in black ink)

TO: Deputy David McCoy

FROM: Kathy Lawrence, ADS Foodservice

DATE: 12/23/02

SUBJECT: Inmate Joseph Christoforo

Today at 10:15 AM inmate Joseph Christoforo requested to speak to me. He stated that Captain Julio Lupo "smacked him in the ear with the palm of his hand" while he was on the inmate food line, and that his ears was ringing. He also stated that he was allright. He did not ask to go to the Infirmary. I told him I would speak to Captain Lupo. When I spoke to Captain Lupo, he told me he tapped him on the ear.(See attached report). At approximately 10:35 another inmate requested to speak to me. He stated that Inmate Christoforo was speaking with the other kitchen workers and they were spreading stories about Julio and were going to file a grievance. Captain Lupo then contacted Deputy McCoy regarding this incident. EOR



5/19/05  App
Exhibit 1
LAWRENCE

SIGNED: _Kathleen C. Lawrence_



1          UNITED STATES DISTRIC COURT

2          DISTRICT OF MASSACHUSETTS

3            NO. 03 CV 12307 RGS

4   - - - - - - - - - - - - - - - - - - -
                                        -
5   JOSEPH CHRISTOFORO,                 -
            Plaintiff                   -
6                                       -
       -VS-                             -
7                                       -
    JULIO LUPO, FRANK G. COUSINS,       -
8   JR., INDIVIDUALLY AND IN HIS        -
    CAPACITY AS ESSEX COUNTY SHERIFF,   -
9   and CERTAIN UNKNOWN INDIVIDUALS,    -
            Defendants                  -
10                                      -
    - - - - - - - - - - - - - - - - - - -

11

12

13      DEPOSITION OF KATHLEEN C. LAWRENCE

14

15        Deposition taken at the law officers

16   of  Merrick, Louison & Costello, 67 Batterymarch

17   Street, Boston, Massachusetts, on Thursday,

18   May 19, 2005, commencing at 2 p.m.

19

20

21

22      DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
      ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
23               617-742-6900

24

4

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                    S-T-I-P-U-L-A-T-I-O-N

3          It is hereby stipulated and agreed by

4     and between counsel for the respective parties

5     that the deposition may be signed under the pains

6     and penalty of perjury and that the filing of said

7     deposition in court is waived.

8          It is further stipulated that all objections,

9     except as to the form of the question, and all

10    motions to strike are reserved until the time of

11    trial.

12                         -  -  -  -

13                    KATHLEEN C. LAWRENCE

14         having been duly sworn, was deposed and

15    testified as follows:

16                    E-X-A-M-I-N-A-T-I-O-N

17         BY MR. MCCORMICK:

18    Q    Would you state your name, please.

19    A    Kathleen Lawrence.

20    Q    And, Ms. Lawrence, where are you presently

21    employed?

22    A    Essex County Correction Facility, Sheriff's

23    Department.

24    Q    If I use the term "Sheriff's Department" will you
```

5

1           know what I'm talking about?

2    A      Yes.

3    Q      Have you ever had your deposition taken before?

4    A      No.

5    Q      I'm going to be asking you a series of questions.

6           There's a couple of ground rules.  First of all,

7           if at any time you need a break, just say so.  If

8           at any time you need to confer with your counsel,

9           obviously, just say so.  If you don't understand

10          the question that I ask, please let me know, I'll

11          try to rephrase it.

12              The other thing is that you need to respond

13          verbally.  We all have a tendency to nod our heads

14          and shake our heads, and the Court Reporter can't

15          take that down.  I also ask that you allow me to

16          finish my question and I'll allow you to finish

17          your answer before either one speaks.  Okay?

18   A      Yes.

19   Q      How long have you worked at the Sheriff's

20          Department?

21   A      Six years and four months.

22   Q      And what is your present position?

23   A      Director of Food Service.

24   Q      What was your position at the Sheriff's Department

6

1      in December of 2002?

2  A   Director of food service.

3  Q   Same position?

4  A   Yes.

5  Q   What were your duties and responsibilities as

6      director of food service for the Sheriff's

7      Department in December of '02?

8  A   I oversaw the kitchen, ordering, supervise the

9      staff.

10 Q   When you say supervise the staff, would that

11     include inmates and correction officers?

12 A   Yes.

13 Q   And when you say supervise, what were you

14     supervising them doing, cooking or preparing the

15     meals?

16 A   Yes, but -- yes.

17 Q   And how did you do that?

18 A   But I had people under me, and they more directly

19     supervised them more so than myself.

20 Q   So would you say would it be usual procedure and

21     practice in 2002 that you would be supervising a

22     group of individuals who would be doing the actual

23     hands on supervising of inmates?

24 A   Yes.

```
 1   Q      Did you have any other involvement after speaking
 2          with Mr. Lupo and Mr. McCoy about the allegations
 3          by Christoforo that Lupo had hit him?
 4   A      No.
 5              MR. MCCORMICK:  I have nothing further.
 6              MR. PFAFF:  Anything?
 7              MR. HODAPP:  Just a few questions.
 8                         E-X-A-M-I-N-A-T-I-O-N
 9              BY MR. HODAPP:
10   Q      Good afternoon, Ms. Lawrence.  I represent
11          Julio Lupo.
12   A      Hi.
13   Q      Referring to the report in front of you, it's
14          dated December 23, 2002?
15   A      Yes.
16   Q      Is that the date you wrote the report?
17   A      Yes.
18   Q      Were the events of the day clearer in your mind
19          when you wrote the report than they are today?
20   A      Yes.
21   Q      Clearer than they are today?
22              MR. MCCORMICK:  I object to leading.
23              MR. PFAFF:  Let's have the question.
24   Q      Were the events of December 23, 2003 at the time
```

```
 1          you wrote the report clearer in your mind then

 2          than they are today?

 3               MR. MCCORMICK:  Objection.

 4               MR. PFAFF:  You can answer.

 5     A    Yes.

 6     Q    And in the report there is certain language that's

 7          quoted, would you if you would please refer to the

 8          report.

 9               MR. PFAFF:  Are you referring to the second

10          line?

11               MR. HODAPP:  The second line.

12               MR. PFAFF:  The quotations in the second line.

13     Q    And it was you, was it not, that put the quotation

14          marks around the specific language, isn't that

15          true?

16     A    Yes.

17     Q    And why did you put quotations marks around

18          specific language in your report?

19     A    I don't remember.  I don't know.

20     Q    You don't know whether or not those were the

21          specific words that were used by Mr. Christoforo

22          when he reported the incident to you?

23     A    I don't remember at this point in time.

24     Q    Because at the time the incident was much clearer
```

```
 1              in your mind than it is today?
 2                   MR. MCCORMICK:  Objection.
 3                   MR. PFAFF:  Asked and answered.  You can have
 4              it again.  The question is at the time that you
 5              wrote the report, the incident was much clearer in
 6              your mind than it is today.
 7     A        Yes.
 8     Q        Did you observe any visible signs of injury on
 9              Mr. Christoforo when he presented to you?
10     A        I don't believe so.
11     Q        Did you direct him to the infirmary for any
12              treatment?
13     A        No.
14     Q        You mention in your report that other
15              inmates -- that another inmate approached
16              you first and said that Mr. Christoforo was
17              speaking with other inmates; do you see that
18              passage, it's at the bottom of your report?
19     A        Yes.
20     Q        Do you recall who that inmate was that approached
21              you?
22                   MR. PFAFF:  Just for the record, I think it
23              says:  Inmate Christoforo was speaking with other
24              kitchen workers; I think you might have said
```

1           inmates, it's actually kitchen workers.

2    Q      Okay.  Do you remember being approached by another

3           kitchen worker?

4    A      No, I don't remember.

5    Q      An inmate spoke to you and an inmate said to you

6           that other kitchen workers were discussing the

7           incident and they were spreading stories about

8           Julio, do you see where that is written in your

9           report?

10   A      Yes.

11   Q      Do you have any reason to believe that when

12          you recorded that information it was not

13          accurate?

14              MR. MCCORMICK:  Objection.

15   A      Can you repeat that.

16   Q      Do you have any reason to believe when you wrote

17          that down what you were writing down was not

18          true?  Do you have any reason now to think what

19          you wrote then was not true?

20              MR. MCCORMICK:  Objection.

21   A      (No response.)

22   Q      In other words, do you have any reason to doubt

23          your own words?

24              MR. MCCORMICK:  Objection.

```
 1   A      No.

 2          MR. HODAPP:  That's all I have.  Thank you

 3   very much, Ms. Lawrence.

 4          MR. PFAFF:  I have one.

 5                  E-X-A-M-I-N-A-T-I-O-N

 6          BY MR. PFAFF:

 7   Q      Kathleen, do you know who the other inmate was you

 8   refer to here?

 9   A      No.

10                  E-X-A-M-I-N-A-T-I-O-N

11          BY MR. MCCORMICK:

12   Q      Ms. Lawrence, we're talking about a report

13   and you're being questioned about a report

14   that you wrote two and a half years ago and

15   the words you used, do you have any independent

16   memory of the events of that day as we sit here

17   today?

18   A      No.

19          MR. MCCORMICK:  Thank you.

20                  E-X-A-M-I-N-A-T-I-O-N

21          BY MR. HODAPP:

22   Q      Do you have any reason to believe that anything

23   you state in your report is untrue?

24   A      No.
```

1           MR. HODAPP:   Thank you.

2               (Whereupon, the deposition was closed

3               at 2:30 p.m.)

4                         -  -  -  -

# EXHIBIT VII

## ORIGINAL

UNITED STATES DISTRIC COURT

DISTRICT OF MASSACHUSETTS

NO. 03 CV 12307 RGS

- - - - - - - - - - - - - - - - - -
                                   -
JOSEPH CHRISTOFORO,                -
          Plaintiff                -
                                   -
   -VS-                            -
                                   -
JULIO LUPO, FRANK G. COUSINS,      -
JR., INDIVIDUALLY AND IN HIS       -
CAPACITY AS ESSEX COUNTY SHERIFF,  -
and CERTAIN UNKNOWN INDIVIDUALS,   -
          Defendants               -
                                   -
- - - - - - - - - - - - - - - - - -

DEPOSITION OF JOSEPH CHRISTOFORO

Volume II

Deposition taken at the law offices

of  Merrick, Louison & Costello, 67 Batterymarch

Street, Boston, Massachusetts, on Thursday,

May 19, 2005, commencing at 10:20 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
617-742-6900

```
 1          work and keep your mouth shut; and that's -- he
 2          punched me in the side of the head thinking I had
 3          said something about a melongena or he heard that
 4          word and punched me in the back of the head.
 5     Q    You say that Julio thought that you had said --
 6     A    I don't know.
 7     Q    -- to Smith --
 8     A    He heard --
 9     Q    Please, please.  You said that Julio thought you
10          were the one who told Smith what a melongena is,
11          what do you base that on?
12     A    I don't base it on anything.  What I said is he
13          heard someone say it and he -- well, he just heard
14          someone say it, he came over, was standing behind
15          me; and that's when he whacked me in the back of
16          the head.
17     Q    How do you know he heard someone say it?
18     A    Because he told us to shut the fuck up and get
19          back to work.
20     Q    Did he use the word "melongena"?
21     A    Did he say that?
22     Q    When he came back to you, did he use the word
23          "melongena"?
24     A    No, no.
```

# EXHIBIT VIII

1

<pre>
 1                                 Volume I
                                   Pages 1 to 91
 2                                 Exhibits 1 to 8

 3            UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
      JOSEPH CHRISTOFORO,
 6              Plaintiff(s),

 7         v.                        Civil Action
                                     No. 03 CV 12307 RGS
 8    JULIO LUPO, FRANK G. COUSINS, JR.,
      INDIVIDUALLY AND IN HIS CAPACITY AS
 9    ESSEX COUNTY SHERIFF, AND CERTAIN
      UNKNOWN INDIVIDUALS,
10              Defendant(s).

11    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12

13        DEPOSITION OF JULIUS J. LUPO, a witness called by

14    counsel for the Plaintiff, taken pursuant to the

15    applicable rules, before Diane L. McElwee, Registered

16    Merit Reporter and Notary Public in and for the

17    Commonwealth of Massachusetts, at the Offices of

18    GILMORE, REES, CARLSON & CATALDO, P.C, 1000 Franklin

19    Village Drive, Franklin, Massachusetts, on Monday,

20    May 16, 2005, commencing at 2:35 PM.

21                    _____

22

23            DIANE L. McELWEE, RPR, RMR

24
</pre>

32

1    Q    Ever use a rifle?

2    A    No.

3    Q    Ever use any means of self-defense that you

4  were taught?

5    A    No.

6    Q    Did you ever strike an inmate?

7    A    Yes.

8    Q    When was the first time you struck an inmate

9  at the Essex County House of Correction?

10    A    December 23d, Joseph Cristoforo.

11    Q    Tell us about that incident.  What happened

12  that caused you to strike Mr. Cristoforo on or about

13  December 23, 2002?

14    A    They were doing the meals.

15    Q    When you say "they," who do you mean?

16    A    The inmates were setting up the trays for

17  lunch feeding.  Inmate Cristoforo was causing a

18  disturbance in the line to slow the production down.

19    Q    What was he doing?

20    A    Talking between all the inmates, causing

21  problems.

22    Q    What problems was he causing?

23    A    Just work problems, work-related problems.

24    Q    Like what?

1    A    Like stopping the inmates from working up to

2  par.

3    Q    Did he physically stop anyone from working

4  up to par?

5    A    No.

6    Q    So he did this, in your opinion, simply by

7  speaking?

8    A    Speaking.

9    Q    What was he doing?

10    A    Swearing.

11    Q    What was he saying other than swearing?

12    A    I don't recall.

13    Q    What specific words, if any, do you recall

14  him saying?

15    A    That this place sucks; we don't have to do

16  this work.

17    Q    Anything else?

18    A    That's all.

19    Q    How many times did he say that?

20    A    I don't remember.

21    Q    More than one?

22    A    No, probably once, maybe twice.  After the

23  first time I went to tell him to be quiet, and then

24  when I went back, then they started again.  They

34

1    started banging.

2        Q    You heard him say, This place sucks; we

3    don't have to do this, words to that effect?

4        A    Something like that.

5        Q    You are not sure what the words were?

6        A    Right.

7        Q    What did you do when you heard that?

8        A    I went over and told him to keep the noise

9    down and keep the line moving.

10       Q    What did he say to you?

11       A    He said something, and I turned my back.

12       Q    Then what?

13       A    He said, Fuck him.

14       Q    Then what did you do then?

15       A    I went back to my table, and when the noise

16   started up again, I went to Cristoforo and flicked

17   his ear and told him to be quiet.

18       Q    When you flicked his ear, as you put it, was

19   he facing away from you?

20       A    No.  He was looking straight ahead.

21       Q    You came at him from the side?

22       A    Yes.

23       Q    He wasn't looking at you when you touched

24   him?

35

1  A  No.

2  Q  When you say "flicked his ear," what hand

3 did you use?

4  A  My right hand.

5  Q  Was it open or closed?

6  A  It was a back flip (indicating).

7  Q  You made a gesture.  You struck him with the

8 back part --

9  A  -- back part of my hand.

10  Q  It was an open hand?

11  A  Open hand.

12  Q  Where on Mr. Cristoforo's body did you

13 strike him?

14  A  His earlobe.

15  Q  His earlobe?

16  A  Yes.

17  Q  Did you touch his neck?

18  A  No.

19  Q  So you gave a backhand and only touched his

20 earlobe?

21  A  No, not a backhand.  I flicked him, a flip.

22  Q  How far away from him when you first

23 initiated --

24  A  Right beside him.

Q     How far away?

A     Not even two inches.

Q     He hadn't turned to look at you?

A     No.

Q     So you were two inches -- you came up upon him two inches away, and he hadn't turned to look at you?

A     Right.

Q     And you flipped the back part of your hand and hit just his earlobe?

A     Just his earlobe.

Q     No other part of his body?

A     No.

Q     You are sure?

A     Yes.

Q     What did he do?

A     Just continued working.

Q     Didn't make any reaction at all?

A     No.

Q     You hit his earlobe, and he didn't bat an eyelash?

A     No.

Q     Didn't turn to you and say, What do you want?

1    A    I told him to be quiet.

2    Q    What did he say to you?

3    A    After that they just kept on working.

4    Q    Did he say anything to you?

5    A    No.

6    Q    Did he make any reaction to you?

7    A    No.

8    Q    Did he put his hand to his ear like he had

9  been hit?

10    A    No.

11    Q    Made no reaction at all?

12    A    No reaction at all.

13    Q    He made no reaction at all, is that your

14  testimony?

15    A    Yes.

16    Q    What did you do then?

17    A    I went to the store.

18    Q    What store?

19    A    A supermarket.

20    Q    You left work?

21    A    Yes.

22    Q    Immediately after striking Mr. Cristoforo

23  and telling him to keep working, keep quiet, what did

24  you do?

1

## ORIGINAL

1          UNITED STATES DISTRIC COURT

2          DISTRICT OF MASSACHUSETTS

3             NO. 03 CV 12307 RGS

4     - - - - - - - - - - - - - - - - -
                                        -
5     JOSEPH CHRISTOFORO,               -
            Plaintiff                   -
6                                       -
                                        -
         -VS-                           -
7                                       -
      JULIO LUPO, FRANK G. COUSINS,     -
8     JR., INDIVIDUALLY AND IN HIS      -
      CAPACITY AS ESSEX COUNTY SHERIFF, -
9     and CERTAIN UNKNOWN INDIVIDUALS,  -
            Defendants                  -
10                                      -
                                        -
11    - - - - - - - - - - - - - - - - -

12

13          DEPOSITION OF JOSEPH CHRISTOFORO

14                 Volume II

15

16          Deposition taken at the law offices

17    of  Merrick, Louison & Costello, 67 Batterymarch

18    Street, Boston, Massachusetts, on Thursday,

19    May 19, 2005, commencing at 10:20 a.m.

20

21

22

23       DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
          ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
24                    617-742-6900

1   work.  We were on a serving line preparing the

2   food for the inmates.  And there is

3   approximately -- there is at that time I believe

4   there's nine people on the line.  I was sitting

5   on -- say this is the table where the food is

6   coming down, I was sitting here, there was a

7   gentleman to my left, a gentleman to my right.

8   And we were talking and doing our job.

9        And then the kid across -- there was a

10  gentleman across from me, which I don't recall his

11  name, but he was wondering why he couldn't take a

12  cooking job in place of my job, which I was

13  cooking.  I was the head cook at the time but not

14  at this point.  I talked to Paul, and he had given

15  me a new position.

16       And the kid was talking to the group of us

17  wondering why he couldn't have a new job.  And he

18  was saying something like he thought he might not

19  be able to get the job because a racial thing

20  because he was black or something.  He was

21  wondering why they weren't allowing him to do

22  something better than he was doing.

23       Julio was in the background, he yelled out why

24  don't you keep your mouth shut, not talking to

1    anyone in particular, I can hear you all the way

2    back here he stated.  So he wasn't talking to me

3    or anybody else, he yelled that out.  I guess he

4    might have heard the gentleman talking, he heard

5    the gentleman talking; so we continued to put the

6    food on the trays.

7    I think on that day I was putting Granola bars

8    on the tray.  And he had come over, and he had put

9    his arm on my shoulder and said, again, you know,

10   I want you guys to keep your mouths shut down

11   here, you know, I can hear you all the way around

12   there across the way.

13   And I believe he called the gentleman

14   across -- he called the gentleman across a

15   melongena he had said, so I believe Mr. Roberts

16   was his last name, I forget his first name though;

17   and he walked away.

18   One of the kids had asked and I believe I had

19   asked at the time what is a melongena.  I didn't

20   know what it meant.  And Ralph Sordillo had

21   mentioned a melongena is an eggplant, being slang.

22   I didn't know what that meant.

23   At that point Julio come back, put -- he

24   stepped behind me and had said get back to fucking

7

```
 1        work and keep your mouth shut; and that's -- he
 2        punched me in the side of the head thinking I had
 3        said something about a melongena or he heard that
 4        word and punched me in the back of the head.
 5   Q    You say that Julio thought that you had said --
 6   A    I don't know.
 7   Q    -- to Smith --
 8   A    He heard --
 9   Q    Please, please.  You said that Julio thought you
10        were the one who told Smith what a melongena is,
11        what do you base that on?
12   A    I don't base it on anything.  What I said is he
13        heard someone say it and he -- well, he just heard
14        someone say it, he came over, was standing behind
15        me; and that's when he whacked me in the back of
16        the head.
17   Q    How do you know he heard someone say it?
18   A    Because he told us to shut the fuck up and get
19        back to work.
20   Q    Did he use the word "melongena"?
21   A    Did he say that?
22   Q    When he came back to you, did he use the word
23        "melongena"?
24   A    No, no.
```

1   Q   How do you know he heard someone use the word

2       "melongena"?

3   A   I don't know.

4   Q   What happened after that?

5   A   Well, after he punched me in the side of the head,

6       he turned and told us to get the fuck back to work

7       and walked away.

8   Q   Okay.  Let's stop there if we may.  When was the

9       first time you saw Julio Lupo on the day of the

10      incident?

11  A   When he came into work.

12  Q   What time was that?

13  A   Seven o'clock.

14  Q   What time did you start work that day?

15  A   4:30 in the morning, five o'clock.

16  Q   You mentioned a change of job description.

17  A   Yes, sir.

18  Q   You began a new job that day?

19  A   Yes, sir.

20  Q   And how did that come about that you were moved to

21      a new job on the day of this incident?

22  A   I asked Paul if I could have a job change because

23      I was being badgered and then insulted and then

24      mentally and physically abused by Julio in the

CASE: 02-H-ECSD-012                Condenselt™                Joseph Christoforo, 1/2/2003

---

**Page 1**

Pages: 1 - 77

ESSEX COUNTY CORRECTIONAL FACILITY
AND SHERIFF'S DEPARTMENT

CASE NO. 02-H-ECSD-012

INTERVIEW OF: JOSEPH CHRISTOFORO

CONDUCTED BY:  MICHAEL J. ROCHE,
              Internal Affairs Investigator

DATE:         January 2, 2003

*[handwritten box: 5/19/05  AFC  Exhibit 3  CHRISTOFORO]*

---

**Page 2**

1    MR. ROCHE: The date is
2  January 2, 2003. I'm Michael J. Roche
3  of the Internal Affairs Unit. I'm with
4  Officer Robinson in Internal Affairs and
5  we're talking with Inmate Joseph
6  Christoforo.
7    THE WITNESS: Yes, sir,
8  right.
9    INTERVIEW BY MR. ROCHE:
10  Q. Okay, Joe. When you first came in the
11    room we had some conversation and I told
12    you our words were being recorded. Are
13    you aware of that?
14  A. Yes, sir.
15  Q. Okay. Do you have a problem with that?
16  A. No, sir.
17  Q. Okay. And the reason we're here this
18    morning is that Internal Affairs
19    received a complaint from Officer
20    Maguire concerning an alleged assault
21    that occurred on you in the kitchen or
22    in the area. We'd just like to find out
23    about that, if you could, if you want to
24    talk to us about that. You don't have

---

**Page 3**

1    to speak to us if you don't want to. We
2  have a complaint and we're gonna
3  investigate it and there's sort of two
4  parts to the complaint. First of all,
5  there's the assault part which Officer
6  Robinson has investigated and then
7  Deputy Center spoke to you?
8  A. Yes, sir.
9  Q. At some point, and was talking about
10    some sexual talk or some sort of talk
11    about --
12  A. Yeah.
13  Q. So I just wanted to talk to you about
14    that too.
15  A. Okay.
16  Q. So, in your own words you can tell us
17    what happened.
18  A. The day of the incident, would that be
19    easier?
20  Q. Yeah.
21  A. Okay. The day of the incident I was
22    going to work. I was assigned a new job
23    the night before from head cook to
24    cleaning of the bathrooms because I had

---

**Page 4**

1    been cooking for a while and I had asked
2  if I could have my job changed because
3  of the stress that I was going through
4  on some of the incidents that I'll be
5  telling you about. And I didn't want to
6  work with a certain individual, have him
7  be my boss --
8  Q. Right.
9  A. -- and I asked if I could possibly have
10    a job change. And, so Paul, who is kind
11    of the boss on the weekends, said, Yeah,
12    you can -- if you want, you can start
13    cleaning toilets and --
14  Q. Who's Paul?
15  A. He's a correctional officer that, I call
16    him Big Paul, I don't know his last
17    name.
18  Q. Okay.
19  A. But he's been there for a while. And he
20    said that the only job available was to
21    empty barrels and clean the bathrooms.
22    And I was like, Fine. That's fine. And
23    so I took the job with enthusiasm. That
24    morning I came in to get my work

---

**Page 5**

1  assignment, he told me what my job
2  detail was and I was fine with that.
3  And I was doing my job as I would
4  normally. I came in to the kitchen
5  area, Julio had just come in and --
6  Q. Julio is who now?
7  A. That was kind of like my boss.
8  Q. Okay.
9  A. He was like a cook and he's the cook,
10  the boss that works for the jail.
11  And I come down and I guess
12  him and Paul were talking and I was
13  doing my job emptying barrels and they
14  were talking. I did my job and then he
15  come over to me and says, I want my
16  apron back. And I was like, 'cause he
17  had given me an apron to work with him
18  and I was -- I was one of the only
19  inmates that got a cloth apron.
20  Q. Yeah.
21  A. So he gave me a cloth apron. He said he
22  wanted it back because he -- I no longer
23  apparently wasn't working for him. So I
24  said, Sure, I says, But it's back at my

**Page 6**

1  room. I says, It's dirty. Do you mind
2  if I clean it first? No, I want you to
3  go get it now and bring it back. I
4  says, All right. And he had mentioned
5  something like when I go to get carts to
6  go get the apron. I went to go get the
7  apron and I brought it back.
8  I was told my assignment by
9  Paul and then again by Julio
10  specifically what my job detail. He
11  seemed a little angered. I said, I have
12  no problem doing it. I, um, one of my
13  jobs is to work the line and that's the
14  assembly to putting all the trays
15  together for the food for the inmates.
16  I proceeded on making the trays.
17  At about nine o'clock I had
18  the computer class which I was told to
19  go to because I go there every day at
20  nine. I went to my computer class.
21  Apparently the teacher called in sick.
22  I came back to the kitchen area. I said
23  to Paul, The computer class was
24  canceled. And then Julio come out of

**Page 7**

1  nowhere and says, Yeah, get back on the
2  line. And he took the guy off and put
3  me back on the line.
4  Q. Okay.
5  A. I went back on the line, we were
6  working. The kid across from me, his
7  name is, um, what is his name, um,
8  Smith, I believe, um, he heard that I
9  wasn't cooking anymore and was kind of
10  wondering why he couldn't get a job -- I
11  guess he was turned down a few times
12  getting a cooking job and he was
13  wondering why he couldn't get a job
14  there. And so he was across from me and
15  I was on the other side and we were kind
16  of just talking. He was talking about
17  it. Julio come running over and says, I
18  can hear you all the way in the back of
19  the dry storage. He goes, Keep your
20  fuckin' mouth shut. And he leaned over
21  the table where I would be, if I was --
22  I was actually sitting here, the kid was
23  sitting here, he put his arm and he
24  goes, You keep -- you shut the fuck up.

**Page 8**

1  I can hear you all the way over in dry
2  storage. I want you to keep your mouth
3  shut. And then he says --
4  Q. He's saying this to who now?
5  A. The kid, Roberts, because he was talking
6  about trying to get a job and he felt
7  like he had -- he couldn't get a job
8  there for whatever reason. I didn't,
9  you know, get into detail --
10  Q. Okay.
11  A. -- but apparently he had his reasons. I
12  guess it was, he thought it was maybe
13  because he was black or something. And
14  Julio had said stuff to him. And then
15  he had said something about, I guess
16  that he had called him a mulignane in
17  Italian --
18  Q. Okay.
19  A. And the kid next to me, which is
20  Italian --
21  Q. Did you hear that?
22  A. Yeah, but I didn't -- I was -- I don't
23  want to pay attention because I just got
24  this new job and I didn't want to get

Page 9

1  yelled at so I kind of heard it but I
2  didn't really, wasn't --
3      MR. ROBINSON: Are you
4  Italian, too?
5      THE WITNESS: Yeah.
6      MR. ROBINSON: Did you know
7  what it meant?
8      THE WITNESS: No. No, I
9  didn't. You know what I mean? I never
10 heard it before.
11 Q. Okay. So he's talking to this kid
12 Smith.
13 A. Yeah.
14 Q. And he calls him a mulignane?
15 A. Yeah, mulignane or something like that.
16 And I -- and I'm not -- I don't know
17 mulignane, I never heard it before so I
18 didn't know what it meant. So the other
19 kid next to -- there was a kid Gene
20 sitting next to me and then this other
21 kid, Ralph Sordillo sitting over here
22 and Ralph had said something to him
23 about when Julio was -- was walking
24 away, he goes, That means an eggplant.

Page 10

1  And then --
2  Q. Who said this?
3  A. The kid Ralph.
4  Q. Ralph? And what is his last name,
5  Ralph?
6  A. Sordillo. I guess told him what it
7  meant. I think Julio thought I said
8  what it meant. So then he turned around
9  and he goes, and then he, he had his
10 hand on my shoulder, and then he goes,
11 And you, you keep your mouth shut and
12 stop egging him on, and then at that
13 time is when he took his hand and went,
14 boom, he punched me right in the ear
15 from behind.
16     MR. ROBINSON: Closed fist?
17     THE WITNESS: Yeah.
18 A. It was kind of -- I think -- I was
19 sitting right here. And I was right
20 there and he had his hand and he just
21 stopped for a second and he goes, And
22 you, you keep your mouth shut and stop
23 egging the kid on and went, and, and I
24 guess it's -- I guess it swung down and

Page 11

1  he hit me right in the ear. It wasn't a
2  slap.
3      MR. ROBINSON: So you were
4  sitting down.
5      THE WITNESS: Yeah, I was
6  right -- I was at the table working like
7  this doing my --
8      MR. ROBINSON: So he's --
9  he's up here like this?
10     THE WITNESS: Right. Behind
11 me.
12     MR. ROBINSON: So he hit you
13 with his left hand or his right hand?
14     THE WITNESS: No, it was his
15 right hand because he had -- he was
16 leaning on me and then he walked away
17 for a second and then he came back
18 and --
19     MR. ROBINSON: So he's
20 behind you?
21     THE WITNESS: Yeah. Like --
22 probably right to the side to me.
23     MR. ROBINSON: He whacked
24 you in the ear?

Page 12

1      THE WITNESS: Whacked me in
2  the ear.
3      MR. ROBINSON: How is it
4  now, all right?
5      THE WITNESS: Yeah, no,
6  believe it or not it still kills to the
7  touch. I don't know, I've been having
8  all these stupid symptoms. I don't
9  know. My -- it still hurts. I get -- I
10 can't sleep at night and right now if
11 you touch this, to the touch it's still
12 painful.
13     MR. ROBINSON: This report
14 says you were throwing up?
15     THE WITNESS: Yeah, well,
16 and I -- do you want me to get to that
17 or what? Do you want me to go in order?
18 Q. Just continue.
19 A. So he hit me in the ear and from him
20 hitting me I, my reflex, I jumped up, my
21 thigh hit the bottom of the metal
22 table --
23 Q. Yeah.
24 A. -- which I went to the nurse, when I was

# EXHIBIT IX



# Essex County Correctional Facility
## & Sheriffs Headquarters
# INCIDENT REPORT
### (PLEASE PRINT and fill in all information in black ink)

TO: Deputy David McCoy

FROM: Kathy Lawrence, ADS Foodservice

DATE: 12/23/02

SUBJECT: Inmate Joseph Christoforo

Today at 10:15 AM inmate Joseph Christoforo requested to speak to me. He stated that Captain Julio Lupo "smacked him in the ear with the palm of his hand" while he was on the inmate food line, and that his ears was ringing. He also stated that he was allright. He did not ask to go to the Infirmary. I told him I would speak to Captain Lupo. When I spoke to Captain Lupo, he told me he tapped him on the ear.(See attached report). At approximately 10:35 another inmate requested to speak to me. He stated that Inmate Christoforo was speaking with the other kitchen workers and they were spreading stories about Julio and were going to file a grievance. Captain Lupo then contacted Deputy McCoy regarding this incident. EOR



SIGNED: *Kathleen C. Lawrence*

1

COPY

1    UNITED STATES DISTRIC COURT

2    DISTRICT OF MASSACHUSETTS

3    NO. 03 CV 12307 RGS

4    - - - - - - - - - - - - - - - - -
                                      -
5    JOSEPH CHRISTOFORO,              -
            Plaintiff                 -
6                                     -
        -VS-                          -
7                                     -
     JULIO LUPO, FRANK G. COUSINS,    -
8    JR., INDIVIDUALLY AND IN HIS     -
     CAPACITY AS ESSEX COUNTY SHERIFF, -
9    and CERTAIN UNKNOWN INDIVIDUALS, -
            Defendants                -
10                                    -
     - - - - - - - - - - - - - - - - -

11

12

13          DEPOSITION OF KATHLEEN C. LAWRENCE

14

15          Deposition taken at the law officers

16   of  Merrick, Louison & Costello, 67 Batterymarch

17   Street, Boston, Massachusetts, on Thursday,

18   May 19, 2005, commencing at 2 p.m.

19

20

21

22        DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
          ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
23                      617-742-6900

24

1    Q    Did you have any other involvement after speaking

2         with Mr. Lupo and Mr. McCoy about the allegations

3         by Christoforo that Lupo had hit him?

4    A    No.

5              MR. MCCORMICK:  I have nothing further.

6              MR. PFAFF:  Anything?

7              MR. HODAPP:  Just a few questions.

8                      E-X-A-M-I-N-A-T-I-O-N

9              BY MR. HODAPP:

10   Q    Good afternoon, Ms. Lawrence.  I represent

11        Julio Lupo.

12   A    Hi.

13   Q    Referring to the report in front of you, it's

14        dated December 23, 2002?

15   A    Yes.

16   Q    Is that the date you wrote the report?

17   A    Yes.

18   Q    Were the events of the day clearer in your mind

19        when you wrote the report than they are today?

20   A    Yes.

21   Q    Clearer than they are today?

22             MR. MCCORMICK:  I object to leading.

23             MR. PFAFF:  Let's have the question.

24   Q    Were the events of December 23, 2003 at the time

1    you wrote the report clearer in your mind then

2    than they are today?

3         MR. MCCORMICK:  Objection.

4         MR. PFAFF:  You can answer.

5  A  Yes.

6  Q  And in the report there is certain language that's

7    quoted, would you if you would please refer to the

8    report.

9         MR. PFAFF:  Are you referring to the second

10   line?

11        MR. HODAPP:  The second line.

12        MR. PFAFF:  The quotations in the second line.

13 Q  And it was you, was it not, that put the quotation

14   marks around the specific language, isn't that

15   true?

16 A  Yes.

17 Q  And why did you put quotations marks around

18   specific language in your report?

19 A  I don't remember.  I don't know.

20 Q  You don't know whether or not those were the

21   specific words that were used by Mr. Christoforo

22   when he reported the incident to you?

23 A  I don't remember at this point in time.

24 Q  Because at the time the incident was much clearer

1    in your mind than it is today?

2         MR. MCCORMICK:  Objection.

3         MR. PFAFF:  Asked and answered.  You can have

4    it again.  The question is at the time that you

5    wrote the report, the incident was much clearer in

6    your mind than it is today.

7  A  Yes.

8  Q  Did you observe any visible signs of injury on

9    Mr. Christoforo when he presented to you?

10 A  I don't believe so.

11 Q  Did you direct him to the infirmary for any

12   treatment?

13 A  No.

14 Q  You mention in your report that other

15   inmates -- that another inmate approached

16   you first and said that Mr. Christoforo was

17   speaking with other inmates; do you see that

18   passage, it's at the bottom of your report?

19 A  Yes.

20 Q  Do you recall who that inmate was that approached

21   you?

22        MR. PFAFF:  Just for the record, I think it

23   says:  Inmate Christoforo was speaking with other

24   kitchen workers; I think you might have said

23

1        inmates, it's actually kitchen workers.

2  Q   Okay.  Do you remember being approached by another

3        kitchen worker?

4  A   No, I don't remember.

5  Q   An inmate spoke to you and an inmate said to you

6        that other kitchen workers were discussing the

7        incident and they were spreading stories about

8        Julio, do you see where that is written in your

9        report?

10  A   Yes.

11  Q   Do you have any reason to believe that when

12        you recorded that information it was not

13        accurate?

14        MR. MCCORMICK:  Objection.

15  A   Can you repeat that.

16  Q   Do you have any reason to believe when you wrote

17        that down what you were writing down was not

18        true?  Do you have any reason now to think what

19        you wrote then was not true?

20        MR. MCCORMICK:  Objection.

21  A   (No response.)

22  Q   In other words, do you have any reason to doubt

23        your own words?

24        MR. MCCORMICK:  Objection.

```
 1   A     No.
 2              MR. HODAPP:   That's all I have.   Thank you
 3        very much, Ms. Lawrence.
 4              MR. PFAFF:   I have one.
 5                    E-X-A-M-I-N-A-T-I-O-N
 6              BY MR. PFAFF:
 7   Q     Kathleen, do you know who the other inmate was you
 8        refer to here?
 9   A     No.
10                    E-X-A-M-I-N-A-T-I-O-N
11              BY MR. MCCORMICK:
12   Q     Ms. Lawrence, we're talking about a report
13        and you're being questioned about a report
14        that you wrote two and a half years ago and
15        the words you used, do you have any independent
16        memory of the events of that day as we sit here
17        today?
18   A     No.
19              MR. MCCORMICK:   Thank you.
20                    E-X-A-M-I-N-A-T-I-O-N
21              BY MR. HODAPP:
22   Q     Do you have any reason to believe that anything
23        you state in your report is untrue?
24   A     No.
```

1            MR. HODAPP:  Thank you.

2                 (Whereupon, the deposition was closed

3                 at 2:30 p.m.)

4                            - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT X

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO. 03 CV 12307 RGS

|  |  |  |
|---|---|---|
| JOSEPH CHRISTOFORO, Plaintiff | ) ) ) ) | |
| VS. | ) ) | PLAINTIFF'S AUTOMATIC |
| JULIO LUPO, FRANK G. COUSINS, JR., INDIVIDUALLY AND IN HIS CAPACITY AS ESSEX COUNTY SHERIFF, and CERTAIN UNKNOWN INDIVIDUALS        Defendants | ) ) ) ) ) ) ) ) ) | DISCOVERY DISCLOSURE |

Pursuant to L.R. 26.2(A) and 26.1(B) the defendants hereby make the following automatic discovery disclosure:

I.    Name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claim of defenses.

DISCLOSURE:

A.    Julio Lupo, 22 Worcester Road, Peabody, MA  01960.

B.    Sheriff Frank G. Cousins, Jr., Essex County Correctional Facility, PO Box 807, 20 Manning Avenue, Middleton, MA  01949-2807.

C.    Joseph Christoforo, 13 Mount Pleasant Drive, Peabody, MA 01960.

D.    Medical Personnel at the Shattuck Hospital and at Essex County House of Correction, including but not limited to Thomas Hedges, M.D.; Dr. Fallhowe; and Eileen Mageary.

LAW OFFICES
CORMICK & MAITLAND
ONE–FORTY–FOUR
MAIN STREET
COUNTRY CROSSING
P.O. BOX 318
NORFOLK, MA 02056
AREA CODE (508)
520–0333

II.    A copy of or description of, by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses.

DISCLOSURE:

A.    July 13, 2003 Grievance.

B.    July 27, 2003 Grievance.

C.    July 29, 2003 Grievance.

D.    July 30, 2003 Grievance.

E.    August 1, 2003 Grievance.

F.    August 3, 2003 Grievance.

G.    August 5, 2003 Grievance.

H.    August 6, 2003 Grievance.

I.    Formal Request Forms, Correspondence, and Newspaper Articles.

J.    Medical Records.

III.    Insurance Agreement.

Not Applicable.

IV.    Expert Witness(es)

The plaintiff has not yet determined the identity of any expert witness, but recognizes his obligation to disclose such information.

Respectfully Submitted,
JOSEPH CHRISTOFORO,
By His Attorney:

Edward J. McCormick, III
BBO No. 329780
McCormick & Maitland
144 Main Street, P.O. Box 318
Norfolk, MA 02056
(508)520-0333

W OFFICES
ICK & MAITLAND
FORTY-FOUR
IN STREET
TRY CROSSING
O. BOX 318
OLK, MA 02056
A CODE (508)
520-0333

## CORRECTIONAL MEDICAL SERVICES
## HEALTH SERVICES REQUEST FORM

Print Name: _Christofers, Joseph_ Date of Request: _10/23/02_

ID #: _10268_ Date of Birth: _11/20/63_ Housing Location: _240B_

Nature of problem or request: _Vomiting._

I consent to be treated by health staff for the condition described.

_____
SIGNATURE

## PLACE THIS SLIP IN MEDICAL BOX OR DESIGNATED AREA
## DO NOT WRITE BELOW THIS AREA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## HEALTH CARE DOCUMENTATION

Subjective: I/m states struck rt side of head this AM. - States he feels dizzy and ♀ vomiting. — pale

Objective: BP 130/80 P 98 R 20 T ___ O₂ sat 98%
130/86 101      PERLA
Pale, diaphoretic. c/o ringing in ears
unsteady gaite -

Assessment:

Plan: PEARL. No nystagmus. ⊕ TM c̄ slight bulge c̄ serous fluid c̄ ↓ RR. c/o tinnitus c̄ nausea.

Refer to: ____ PA/Physician ____ Mental Health ____ Dental

will order again / Antivert c̄ observe

Signature: _____ Title: _____ Date: _____ Time: _____

CMS 7166 REV 10/94

12-23-02

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

Patient Name: Christopher Joseph    I.D. # 18768    Institution _____

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 12/23/02 | 11A | I/m Christopher admitted to infirmary F̄ a head injury - I/m c/o complaining of ringing in rt ear), feeling dizzy and vomiting. Vital signs stable, Neuro checks stable. Resting in nops. | |
| 12/23/02 | 7:15p | S) "my ear hurts. I have a lump on the back of my ear" O) small lump on Lt posterior ear & head c̄ ecchymosis. ⊖nausea ⊖vomiting A) Alt in comfort P) cont to monitor ——— Welmonica RN | |
| 12/23/02 | 9p | Neuro signs done PERLA c/o H/A Motrin given ———— Welmonica RN | |
| 12/23/02 | | Addendum: BP 120/70 AP 81 O2 Sat 97% — Welmonica RN | |
| 2/24/0 | 8:15a | s/p assault to R ear yesterday. Feels better. Denies tinnitus. Still feels slight fullness R ear. Denies N/V. TM intact. PEARL. Steady gait. Denies vertigo. Will clear to population. Alt to RTC c̄ S̄ return | |

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

Patient Name: _Christofaro, Joseph_    I.D. #: _10768_    Institution: _Ccef_

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 12-24-4 | 11⁰⁰ₐ | Ⓢ Hit by officer Ⓡ ear while working in kitchen. c/o nausea, dizziness & ringing | |
| | | Ⓞ Pt pale, vomiting @ nsg station BP 120/80 P 98 R 20 Sat 98% pt mildly diaphoretic, difficulty c̄ steady gait ? 2nd dizziness PEARL. No nystagmus. TM intact c̄ slight bulge & serous fluid c̄ к̄ L R. | |
| | | Ⓐ Assault to Ⓡ ear | |
| | | Ⓟ Observe, antivert, tigan prn | |
| | | J. Haeers | |

*Essex County Correctional Facility*

*&*

*Sheriff's Headquarters*

INFIRMARY CLEARANCE

TO: _____CO_____ (RECEIVING UNIT)    DATE: 12/24/02

FROM: INFIRMARY/MENTAL HEALTH (CIRCLE ONE)    TIME: 09W

INMATE (PRINT NAME) _Joseph Christoforo_ HAS BEEN EXAMINED AND IS MEDICALLY/PSYCHOLOGICALLY RELEASED FROM THE INFIRMARY TO RETURN TO POPULATION.

REMARKS/ORDERS: _med cleared 12/24 JH_
_Cleared by Mental Health 12/24/02_

DOCTOR: _J. Hall N P_
(PRINTED NAME)                    (SIGNATURE)

M.H. CLINICIAN: _Robert Moss MSW_
(PRINTED NAME)                    (SIGNATURE)

CHARGE NURSE: _Beth Erwin_
(PRINTED NAME)                    (SIGNATURE)

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

Patient Name: Christoforo, Joseph   I.D. #  10768   Institution: ECHF

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 12-24-02 | 900A | Addendum: Pt also mentions bruise @ thigh. Reports hit leg on table when reacting to assault to ear by jumping up. 3½cm long x 2cm wide ant @ thigh ecchymotic area. — J Hallews | |
| 12/24/02 | 0930 | BP 104/84 sitting, BP 118/88 standing. I/M denies any dizziness when Δ position. P remained regular @ 80. T 97.5. lung clear. Pupils ERL. ∅ N, ∅ V. Eating + drinking well. I/M requesting to back to block. I/M refused medication as "I am not dizzy." C/O "sore ear." ∅ C/O H/A. Will F/u c̄ N.P./MD for return to block. — Jeff Ozne | |
| 12/26/02 | 9A | Cont' C/o dizziness denies vertigo. ∅ pain in ear c̄ blowing nose & throbbing while supine. C/o "lightning rod feeling up into my brain." Speech clear & rapid. States sx ↑ c̄ exercise while shoveling. Color pale → pink c̄ rest. States epistaxis <5min upon waking this am. Nausea mild ⊅ exercise. Denies vomiting. Rec'd BP 108/80. Cleared to return to block. F/u appt c̄ NP this eve. D.Danson | |

# EXHIBIT XI

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH CRISTOFORO,<br>**Plaintiff**<br><br>vs.<br><br>JULIO LUPO,<br>FRANK G. COUSINS, JR... Individually and<br>in His Capacity as Essex County Sheriff, and<br>CERTAIN UNKNOWN INDIVIDUALS<br>**Defendants** | CASE NO: 03-12307 RGS |

## DEPOSITION SUBPOENA
### (F.R.C.P. Rule 30(A) and Rule 45)

TO:    Keeper of the Records
New England Eye Center
750 Washington Street
Boston, MA 02111

Greetings:

**YOU ARE HEREBY COMMANDED** in the name of the United States District Court for the District of Massachusetts, in accordance with the provisions of Rule 45 of the Federal Rules of Civil Procedure to appear at the office of Attorney Thomas J. Freda, **Monahan & Padellaro**, 43 Thorndike St., Cambridge, MA 02I4I on the **28**th day of **April, 2005 at I0:00 a.m.** and from day to day thereafter, until your deposition is completed, to give evidence of what you know relating to the above named action on behalf of the **Defendant, Julio Lupo** before a Notary Public of the Commonwealth. You are further required to bring with you:

The entire and complete medical record of Joseph Christoforo, social security number: 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.

In lieu of attending, the Keeper of the Records may produce on or before the deposition date a certified copy of all documents described above within the deponent's possession, custody or control to the above listed attorney.

Hereof fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

Dated at Cambridge, this **19**th day of **March, 2005**

Jay Hodapp
Attorney for Defendant

Notary Public Thomas J. Freda
My Commission Expires: 10-20-06

Certificate of Service
I, Jay Hodapp, certify that I served a copy of this deposition notice on the parties in this case by regular mail, postage prepaid.

Jay Hodapp

DATE 3-30-05
A TRUE COPY ATTEST

Ronald M. DiBirgio
CONSTABLE / PROCESS SERVER
DISINTERESTED PERSON

# New England Eye Center * Tufts University School of Medicine



750 Washington Street, Box 381, Boston, Massachusetts  02111



THOMAS R. HEDGES, III, M.D.
*Professor of Ophthalmology*
*and Neurology*

*Director, Neuro-Ophthalmology*
Office: (617) 636-5488
1-800-231-3316
Fax: (617) 636-4866

February 14, 2005

Edward J. Mc Cormick III
Gilmore, Rees, Carlston & Cataldo, P.C.
1000 Franklin Village Drive
Franklin, MA  02038

Re:  Joseph Cristoforo

Dear Attorney Mc Cormick:

Enclosed you will find the records regarding Mr. Cristoforo, as well as a report including the information you requested in your letter of February 2, 2005.

Sincerely,

Thomas R. Hedges III, M.D.

MEDICAL REPORT
RE: JOSEPH CRISTOFORO
    DOA  12-23-02
    DOB  11-20-63

Mr. Cristoforo was referred to me on the 30th of July, 2003. He told me that on December 23rd he was struck in the left ear and neck during an altercation. One month later he started to have spasms involving the left side of his face, as well as headaches on the left side. He also noted that he had had symptoms reminiscent of migraine years before. These were characterized by flashing lights lasting minutes with some blurring of vision followed by severe pain and nausea. This required Zonig for control. He had been seen by a neurologist previously. He had had a CAT scan and MRI scan which were apparently unremarkable. He had been referred to me for Botox treatments. My examination demonstrated decreased visual acuity on the left side to 20/60 and variable spasms of the eyelids. There was a relative afferent pupillary defect on the left side. Introcular pressures were 18mm of mercury on the right and 24 on the left. At that time I was not impressed with significant funduscopic abnormalities.

He returned to see me for a follow up visit on the 30th of June, 2004. He continued to have some increase in introcular pressure to 22mm mercury on the left side. His visual acuity was reduced to about 20/200. A tangent screen visual field was normal. A visual evoked potential recording showed slight decrease in amplitude on the left side, and optical coherence tomography showed slight thinning of the retinal nerve fiber layer, also on the left side. At that time I felt that he had hemifacial spasm and glaucoma both on the left side. I started him on Xalatan drops. I also gave him Botox injections to the left eyelid to see if this might help control his hemifacial spasm.

I gather he subsequently saw Dr. Mattox who felt that he could have open angle glaucoma on the left side possibly related to previous trauma.

Mr. Cristoforo therefore has two diagnoses. One is open angle glaucoma with mild optic neuropathy. This could be related to trauma that might have occurred at any time in the past. The other diagnoses is mild hemifacial spasm. This can be traumatic, but it is almost always of spontaneous onset due to changes in the relationship between the normal blood vessels and the 7th nerve intracranially. I gather from Dr. Mattox's note that Mr. Crisoforo's hemifacial spasm did respond to the Botox injections that I provided for him. However, I have not seen Mr. Crisoforo since I provided him with the injections and do not know how he is doing with regard to that.

Neither the glaucoma nor the hemifacial spasm should cause any restrictions in his activity.  He did not appear to have any significant disfigurement during any of the visits except for some slight increase in blinking on the left side.  I therefore cannot determine if there are any permanent impairments that might follow from this.  I do recommend follow up of his glaucoma with an ophthalmologist.  He will probably need to remain on drops at least for the foreseeable future.  It is difficult for me to relate the two diagnoses mentioned above to the incident of December 23, 2002.  Mr. Cristoforo did not volunteer that his vision had been directly affected by the injury when I initially saw him on the 30th of July 2003, and the hemifacial spasm did not appear until one month after the injury.  Also, hemifacial spasm is rarely due to trauma.

I hope that this information is helpful to you.  I would be more than happy to try to help out in any way I can in the future.

Sincerely,

Thomas R. Hedges III, M.D.



# New England Eye Center * Tufts University School of Medicine

750 Washington Street, Box 450, Boston, Massachusetts 02111-1533



Cynthia Mattox, M.D., F.A.C.S.
*Vice Chair for Clinical Services*
*Assistant Professor of Ophthalmology*

*Specializing in Glaucoma, Cataract*
*and Anterior Segment*
Office: (617) 636-8108
Patient Appts: (617) 636-4600
1-800-231-3316
Fax: (617) 636-4866
Email: cmattox@tufts-nemc.org

July 21, 2004

Thomas Hedges, M.D.
New England Medical Center
750 Washington Street, Box 450
Boston, MA 02111

RE:    Joseph Cristoforo
DOB: 11/20/1963

Dear Tom:

Thank you for referring this 40-year-old male for an evaluation of possible glaucoma. As you know, he has complained of a hemifacial spasm on the left side and has recently undergone Botox treatment for this. He notes that the spasm developed after a blow to the left temple area left parietal area of his head in 2003. He did not suffer blunt trauma to the eye or eyelids at the time. Recently in your office on June 30, 2004, he was found to have intraocular pressure of 19 O.D., 22 O.S. And in July 2003, the IOP measured 18 O.D. and 24 O.S. You started him on Xalatan q.h.s. O.S. on June 30, 2004. Interestingly, the patient says he wore glasses years ago, but could not wear them while working as an arborist due to trouble with depth perception. And with refraction today, his right eye is plano, and the left eye is – 4.50+1.00X 55 and refracts to 20/20.

Intraocular pressure today was excellent measuring 14 O.D. and 11 O.S. His central corneal thicknesses are normal. I agree he has an afferent pupillary defect on the left side. The anterior segment examination was normal without any signs of pigment dispersion syndrome or trauma to the iris. And interestingly, he did not show any sign of hemifacial or periocular spasm and I noticed perhaps a very slight ptosis on the left. Gonioscopy reveals open angles to ciliary body bands for 360 degrees in the right eye. The left eye is open to ciliary body band and nasally appeared to be possibly recessed. Visual field testing was full in the right eye. The left eye shows a possible early defect with generalized loss of sensitivity and an enlarged blind spot and possible early superior arcuate scotoma. The view of the optic disk shows moderate cup in the right eye with intact rim and normal appearing retinal nerve fiber layer on inspection. The left optic disc is slightly anomalous in appearance and there is marked diffuse decrease in the retinal nerve fiber layer by examination. This is confirmed by OCT, which shows thinning especially inferiorly in the left eye.

Page 2
July 21, 2004
Thomas Hedges, M.D.
Re:: Joseph Cristoforo


It is unclear as to the cause of his glaucoma. It could be POAG early onset or it could be due to trauma in the distant past, but the patient cannot recall any significant eye injury. There is no family history either. In any event, he does deserve to have treatment for this. He was having difficulty with the cost of the Xalatan and so I offered to change to Betagan O.S. q.a.m. which should be lower cost for him. He will be returning in one month to see if this is effective. We can always go back to the Xalatan if need be since it does appear to have worked nicely. Thank you for referring him.

Sincerely,


Cynthia Mattox, M.D.

Dictated but not read

CM/shp

04-00598410.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO. 03 CV 12307 RGS

JOSEPH CHRISTOFORO          )
        Plaintiff          )
                     )
VS.          )
                     )
JULIO LUPO,          )
FRANK G. COUSINS, JR.,          )
INDIVIDUALLY AND IN          )
HIS CAPACITY AS          )
ESSEX COUNTY SHERIFF, and          )
CERTAIN UNKNOWN          )
INDIVIDUALS          )
        Defendants          )

## PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT, FRANK G. COUSINS, JR.'S, REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 6:

All medical records, surgical records, psychological records, diagnostic and treatment documents, including invoices, prescriptions, and therapist's session notes, financial records, bills, invoices, writings, notices, memoranda relating to your physical, medical or psychological conditions, illnesses or disabilities, including, but without being limited to those of doctors, nurses, practitioners, hospitals, clinics, institutions or other health care providers or third party or governmental health or accident insurer, without regard to whether it is your contention that the defendant, or any agent or employee of the defendant, caused said physical, medical or mental conditions, illnesses or disabilities for a period from 1995, to the present.

**RESPONSE NO. 6:**

**Objection**.  The plaintiff objects to this interrogatory on the grounds that it is irrelevant

to the issues raised in the pleadings of this case, is impermissibly broad, not calculated to lead to

the discovery of admissible evidence and exceeds the scope of reasonable discovery per the

Federal Rules of Civil Procedure.  Notwithstanding this objection and without waiving same,

the plaintiff attaches hereto documents responsive to this request which are in his custody,

possession and control, in addition to those previously produced in the Plaintiff's Automatic

Discovery Disclosure.

**SUPPLEMENTAL RESPONSE NO. 6:**

The plaintiff attaches hereto additional documents which are in his custody, possession

and control, specifically the records of Lemuel Shattuck Hospital.

The plaintiff reserves the right to supplement this response prior to the time of trial.


Respectfully Submitted,
JOSEPH CHRISTOFORO,
By His Attorney:


Edward J. McCormick, III
BBO No. 329780
Gilmore, Rees, Carison & Cataldo, P.C.
1000 Franklin Village Drive
Franklin, MA  02038
(508) 520-2200

Dated:

279025.1                                          2

## CERTIFICATE OF SERVICE

I, Edward J. McCormick, III, do hereby certify that on this 12 day of _____ 2005, I served a copy of "Plaintiff's Supplemental Response to Defendant, Frank G. Cousins, Jr.'s, Request for Production of Documents, via first-class mail, postage prepaid, upon the following counsel of record:

Jay Hodapp, Esq.                         Stephen Pfaff, Esq.
Monahan & Padellaro                      Merrick Louison & Costello
43 Thorndike Street                      67 Batterymarch Park
Cambridge, MA 02141-1174                 Boston, MA 02110


_____
Edward J. McCormick, III

```
RUN DATE: 04/01/05              Lemuel Shattuck Hospital                      PAGE 1
RUN TIME: 1606                CORRESPONDENCE REQUEST DETAIL
```

```
REQUEST #  4419                      STATUS: COMPLETE   TYPE: ATT

                                     DATE NEEDED:                   02/08/05
                                     LOGGED ON:                     02/08/05
REQUESTOR
     NAME: GILMORE, REES, CARLSON&CATALDO   LAST LETTER:
  ADDRESS: 1000 FRANKLIN VILLAGE DRIVE   COMPLETED BY: DRAINEY     04/01/05
           EDWARD J McCORMICK
           FRANKLIN  MA  02038
    PHONE: (508)520-2200

UNIT #    LS00120671                 PAID? N   PAGES:     7  FEE:      7.75
          CHRISTOFORO, JOSEPH

REQUESTED INFO
          CR            COMPLETE RECORD

ACTIVITY   DATE        TYPE           USER       LETTER
           02/08/05    STATUS LOGGED  DRAINEY
           04/01/05    STATUS COMPLETE DRAINEY
```



LEMUEL SHATTUCK HOSPITAL
170 Morton Street
Jamaica Plain, MA 02130
617.522.8110
www.shattuckhospital.org

```
LAST NAME        CHRISTOFORO          INST            OUTPATIENT HOS LE
    FIRST/MI     JOSEPH
                                      MED REC #       000120671
AKA LAST NAME                         ADMISSION #     000345756
AKA FIRST                             ADMIT DATE      01/22/03
ADDRESS          20 MANNING AVE           TIME        10:27
CITY             MIDDLETON            UNIT / NS       OUTPATIENT SERVIC
STATE/ZIP        MA / 01949           ROOM / BED          /
PHONE: HOME      978-750-1900         LANGUAGE        ENGLISH
          BUS       -  -              SERVICE         ENT


DOB/AGE          11/20/63 - 39        TYPE            NEXT OF KIN
RACE             WHITE                RELATIONSHIP    MOTHER
ETHNIC           UNKNOWN              LAST NAME       CHRISTOFORO
RELIGION         UNKNOWN                 FIRST        JOANNE
SEX / MARITAL    M / NEVER MARRIED    ADDRESS         13 MT PLEASANT DR
SS #         .   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          CITY            PEABODY
                                      STATE           MA /
Financial Class CORRECTIONAL MEDICAL S ZIP            01960
                                      PHONE: HOME     978-531-7879
                                                BUS      -  -
INS INFO    MIDDLETON HOC
```

```
   Admit Clinician JAMESON        JOHN J  55 Referred By
                                          ENTERED BY      CAROL PRESCOTT

Discharge Diagnosis and Procedure Codes: (see attached sheet)
Coded by:    _____                              D/C Date _____

Physician (print name): _____  Date: _____
```

printed on recycled paper

**Lemuel Shattuck**
HOSPITAL

### Initial Consultation Request

☐ Urgent (within 24 hours) I notified the consultant
☐ Routine (within 72 hours)
☐ To be scheduled (first clinic opening):

From: ENT   To: AUDIO

Reason For Consult: _____

☐ Interpreter needed:

History and Pertinent Clinical or Diagnostic test results:

C/o (L) H loss
since punch in
L ear two ago

Requesting Practitioner: _____ Phone/Beeper: _____ Date: 1/27/03 Time: _____

### Consultant's Report

01-29-03- No-show

02-05-03 7/4 reveals high frequency
sensorineural HL = AS

→ ENT

Page ___ of ___

Consultant's Signature/Print: _____ Halliday

Phone/Beeper: X3272

Date and time: 02-05-03   11:00 AM

White Copy- Medical Record    Yellow- Requesting Practitioner    Pink- Consultant

03-74-med-06/01

12-06-71          AGC
CHRISTOFORO, JOSEPH
11/30/63 M
MIDDLETON HCC
978-750-1900   01/03 CP

Lemuel
Shattuck
HOSPITAL

### Clinic Visit ~ Follow-up Consultation

Date: 2/21/03    Clinic: Neuro    Primary Provider: Dr Bharani

Vital signs: BP 113/74    P 76    RR 20    Temp 96.4    Wt 205    O2-Sat 98 %

1st visit

Pt referred by ENT service due to his c/o
(L) HA + (L) Blepharospasm p̄ punched in
(L) ear a mo. ago. A+O X 3.
Seen + examined by Dr Bharani. Pls see
MD's note for A/P

Referral to NEMC for EMG + Nerve Conduction
Studies. Dr Bharani will call for appt
to get BOTOX Tx. Pls see also other see.
Tx.
RTC PRN.

Pls F/U by calling NEMC EMG dept
617 636 7580.

[signature]

Page ___ of ___

Consultant's Signature/Print _____

_____

Phone/Beeper: _____

RTC: _____

White Copy: Medical Records    Yellow Copy: Requesting Practitioner

OPD LS 06/01

Addressograph

CHRISTOFORO, JOSEPH    ACO
11/20/63  M
MIDDLETON HCD
                01/03  GF

**Lemuel Shattuck HOSPITAL**

### Initial Consultation Request

2/21/03 @ 2 PM

From: ENT        To: NEUROL

☐ Urgent (within 24 hours) I notified the consultant
☐ Routine (within 72 hours)
☐ To be scheduled (first clinic opening):

Reason For Consult: _____

History and Pertinent Clinical or Diagnostic test results: _____

C/o L HA + L Blepharospasm
since punched in L ear
1 mo ago

☐ Interpreter needed:

Requesting Practitioner: _____    Phone/Beeper: _____    Date: 1/24/03    Time: _____    (B1)

### Consultant's Report

40 y R hander with no VMH. Was in a store
when suddenly punched hard over L ear
since have some dizziness (unsteady) and
from 2mo later - L blepharospasm. ENT neg.
CT & IAC NL. L tinnitus / taste change etc.

Exam: MS - NL.
CN I - XII - NORMAL    PERRLA
                        Fundus NL.
Motor - NL.    Cerebellar - NL.
Sensory - NL.
Gait - Normal    - Romberg
Coordin - NL.    Axial balance NL.

Imp. Blepharospasm.
Rec. BOTOX treatment at NEMC
     Voltaren for h/a - 50 mg po QD x 5 days.
     RTC PRN                    Page    of

Consultant's Signature/Print: _____

Phone/Beeper: _____ PRN
Date and time: _____

White Copy  Medical Record    Yellow Requesting Practitioner    Pink  Consultant

03-74-med-06/01

12-06-71          ACC
CHRISTOFORO, JOSEPH
11/20/63 M
MIDDLETON HCC
978-750-1900    01/03 OP



Lemuel
Shattuck
**HOSPITAL**

### *Clinic Visit ~ Follow-up Consultation*

Date: 1/22/03    Clinic: ENT    Primary Provider: JAMESON

Vital signs: BP _____ P _____ RR _____ Temp _____ Wt _____ O2-Sat _____

NSS  C/O dizziness L eye constantly moving +
4x R F s/p Head injury 12/23/02 Please note MD's
recommendations & order appt - Audio Wed 1/29/03 @ 9am & neuro 2/21/03

(@) 2F + Cal Radiology for CT MRI Ritt Valgely Rx

MD  S/3 injury to L ear (Punch) 1 mo ago

c/o  1) Positional vertigo
     2) ? mild ↓ hearing
     3) L Blepharospasm (since injury only)
     4) L side h. aches - severe

Exam    L Blepharospasm    FN o/w NL
        L Tm   WNL
        R Tm   WNL
        Vus ~   nal  cavity ~
        jaw ~
        Dix Hall pike Testing - No Nystagmus w/
                              Head Down L & Down R
                              → mild dizziness

Imp + Rec
     1) Neuro eval
     2) MRI Head
     3) CT Temporal bones
     4) Audio → RTC C ENT

Page _____ of _____

Consultant's Signature/Print
_____

Phone/Beeper: _____

RTC: _____

White Copy  Medical Records    Yellow Copy  Reporting Practitioner

OPD LS 05/01

Addressograph

12-06-71              ACC
CHRISTOFORO, JOSEPH
11/20/63 M
MIDDLETON HOC
978-750-1900  01/03 CP

Department of Radiology
Lemuel Shattuck Hospital
Massachusetts Department of Public Health
170 Morton Street
Jamaica Plain    MA    02130-3782

Telephone: (617) 971.3366
Facsimile: (617) 971.3856

# RADIOLOGIC INTERPRETATION

Name (last, first):   CHRISTOPHER, JOSEPH
Hospital #:           12-06-71
Date Ordered:
Ordering Physician:   SMITH

Case #:
Date of Birth:              11-20-63
Site of Exam Origination:   LSH MIDDLETON,HOC
Technologist's Initials:    EP

**Examination:** IAC CT

**Date Exam Performed:**    02-13-03

**Clinical Indication:** Hearing loss, trauma, vertigo, left ear involvement.

**Interpretation:**
Technique: 1mm axial and direct coronal sections through the temporal bones with additional 3mm slices anteriorly and posteriorly. There is no prior study for comparison.

Findings: The visualized bony structures are intact. No fluid is identified within the mastoid air cells. The middle and inner ear structures are within normal limits. No fracture or bony erosions are identified.

No discrete soft tissue abnormalities are noted, although this study is tailored for bony structures.

**Impression:** Normal temporal bone study. No evidence of fracture or bony irregularity.

If there is consideration for cholesteatoma, an MRI of the IAC is recommended.

Radiologist: James Burch, M.D.
Date of dictation, transcription, printed and sent: 2/14'03: mkp

# REPORT OF HEARING EXAMINATION

**LEMUEL SHATTUCK HOSPITAL**
170 Morton Street
Jamaica Plain, MA 02130
(617) 522-8110 Ext. 272

Thomas J. Hallahan, Sc.D.

Patient: Christoforo, Joseph
LSH#: 12-06-71
D.O.B.: 11-20-63
Floor/Room: Middleton 110C
Referred by: ENT
Date of Test: 02-05-03



**TEST CONDITIONS**

RELIABILITY

GOOD _✗_  FAIR _✗_  POOR ____

AUDIOMETER _GAAJP_

### AUDIOGRAM KEY

|  | Right (red) | Left (blue) |
|---|---|---|
| A/C unmasked | O | X |
| A/C masked | △ | ■ |
| B/C unmasked | < | > |
| B/C masked | [ | ] |
| NR = No Response | ↓ | ↓ |
| Soundfield | S | S |
| Aided | A | A |

## SPEECH AUDIOMETRY

| Speech Recep Thresholds | Score | Level | Score | Level | MCL | UCL |
|---|---|---|---|---|---|---|
| Ear | | | | | | |
| Right | 15 | 96% | 40SL | | | |
| Mask | | | | | | |
| Left | 20 | 96% | 40SL | | | |
| Mask | | | | | | |

MLV ✗  RECORDED
Discrim for Speech List W-22

## STAPEDIUS REFLEX

| | FREQ. | 500 | 1K | 2K | 4K |
|---|---|---|---|---|---|
| Contra | S → RE | | NT | | |
| | S → LE | | | | |
| Ipsi | S → RE | 85 | 80 | 80 | 85 |
| | S → LE | 85 | 85 | 85 | 85 |

## TYMPANOGRAM



REMARKS:

Pt.    c/o vertigo / ? HL - AS
               s/p trauma- trauma- ① ear.

Results:
   AU - Essentially WNL, except high frequency SNHL
           AS only 6K-8KHz.
   Excellent discrimination ability.
   Normal tympanograms & ipsilateral reflexes

Impress:
       HF HL - AS

Rec:    Monitor AS

_Signature of Audiologist_

# EXHIBIT XII

1

# ORIGINAL

1              UNITED STATES DISTRIC COURT

2              DISTRICT OF MASSACHUSETTS

3                 NO. 03 CV 12307 RGS

4      - - - - - - - - - - - - - - - - - -
                                          -
5      JOSEPH CHRISTOFORO,                -
                Plaintiff                 -
6                                         -
       -VS-                               -
7                                         -
       JULIO LUPO, FRANK G. COUSINS,      -
8      JR., INDIVIDUALLY AND IN HIS       -
       CAPACITY AS ESSEX COUNTY SHERIFF,  -
9      and CERTAIN UNKNOWN INDIVIDUALS,   -
                Defendants                -
10                                        -
       - - - - - - - - - - - - - - - - - -

11

12

13          DEPOSITION OF JOSEPH CHRISTOFORO

14                   Volume II

15

16          Deposition taken at the law offices

17     of  Merrick, Louison & Costello, 67 Batterymarch

18     Street, Boston, Massachusetts, on Thursday,

19     May 19, 2005, commencing at 10:20 a.m.

20

21

22

23        DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
          ONE STATE STREET, BOSTON, MASSACHUSETTS 02109
24                      617-742-6900

112

1          assaulted.

2     Q    He threatened you a number of times following the

3          assault?

4     A    Not that assault, the other assaults.

5     Q    Did he talk to you at all following the assault of

6          December 23, 2002?

7     A    No.

8     Q    Did anybody threaten to have you lugged if you

9          pressed your complaint against Julio Lupo for the

10         incident of December 23, 2002?

11    A    Not that I recall.

12    Q    Do you have your statement in front of you?

13    A    Yes, sir.

14    Q    Would you refer to page 65, please.

15    A    (Complies.)

16    Q    After having read those passages, does that

17         refresh your recollection as to whether or not

18         anybody ever threatened to have you lugged if you

19         pressed a complaint in connection with this

20         incident?

21    A    On my answer, I don't want to get lugged out of

22         jail because that's what happens in the past to

23         people that would press charges.

24    Q    Are you now or have you seen any psychologists or

1        psychiatrists for any emotional distress or

2        psychologic injuries you claim as a result of the

3        incident of December 23rd?

4   A   Not as of today, no.

5   Q   Or any of the other incidents of unwanted or

6        inappropriate conduct on the part of Julio Lupo?

7   A   No, sir, not today.

8   Q   Who is Ben Lafortune?

9   A   He worked in the kitchen too.

10  Q   Have you had any contact with Ben since you left

11       the House of Correction?

12  A   No, sir.

13         MR. HODAPP:  That's all I have.  Thanks.

14             E-X-A-M-I-N-A-T-I-O-N

15         BY MR. PFAFF:

16  Q   Mr. Christoforo, my name is Stephen Pfaff.  I

17       represent the Sheriff both individually and in his

18       official capacity.  I have some questions for you.

19         I would like you to take a look at your

20       Answers to Interrogatories here, No. 5, from

21       Interrogatories that I sent to you.  And on page 5

22       of that, I would just like to have you take a look

23       at this paragraph at the top and just read that to

24       yourself if you would.  Just let me know when