UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12307-RGS

JOSEPH CHRISTOFORO

v.

JULIO LUPO, FRANK G. COUSINS, JR.,
Individually and in His Capacity as Essex County Sheriff, and
CERTAIN UNKNOWN INDIVIDUALS

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT

November 14, 2005

STEARNS, D.J.

On November 19, 2003, inmate Joseph Christoforo filed this Complaint against Julio Lupo, a former Assistant Director of Food Services at the Essex County House of Correction (ECHC), and the Warden of the Jail, the Sheriff of Essex Country, Frank Cousins, Jr. The Complaint accuses Lupo of a malicious and unprovoked assault in contravention of the Cruel and Unusual Punishments Clause of the Eighth Amendment (Count I). Cousins is said to have breached his supervisory duty by failing to prevent Lupo's assault on Christoforo (Count II).[1] Both counts are framed under the federal Civil Rights Act, 42 U.S.C. § 1983. On June 17, 2005, Cousins moved for summary judgment, arguing that the court has no jurisdiction to hear Christoforo's claims. Cousins also

---

[1] In Count III of the Complaint, Christoforo named various "John Doe" defendants as sharing responsibility for the assault. Discovery is now complete and Christoforo has not amended the Complaint to provide actual names for the "John Doe" defendants. Consequently, Count III will be DISMISSED. See Figueroa v. Rivera, 147 F.3d 77, 83 (1st Cir. 1998).

contends that as a factual matter Christoforo is unable to prove that he knew or should have known of Lupo's violent tendencies. On June 20, 2005, Lupo also moved for summary judgment, arguing that the force he used against Christoforo was justified. In the alternative, he maintains that any injury to Christoforo was *de minimus* and therefore not actionable under the Eighth Amendment.

## BACKGROUND

In the light most favorable to Christoforo as the nonmoving party, the material facts are as follows. Christoforo worked as a cook in the kitchen at ECHC under Lupo's supervision. Lupo singled out Christoforo for abusive treatment. In the presence of other inmates, Lupo would imply that Christoforo was bisexual and would suggest that Christoforo have sex with him and a woman friend. Lupo also required Christoforo to extract his food handling gloves from Lupo's pant pocket, claiming sexual gratification from the touching. According to a fellow inmate, Ralph Sordillo, Lupo "yells Christoforo's name all the time. He yells his name and picks on him, makes him clean his mess up and, you know, treats him like shit. Treats him like he's dirt, and you know, makes his life miserable in the kitchen." Christoforo alluded to Lupo's sexual harassment in a conversation with Arthur Legalt, a prison guard, but was too embarrassed to provide any details. Christoforo never formally complained to jail administrators about Lupo's conduct.[2]

---

[2] The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires that a prisoner complaining about any aspect of prison life exhaust "such administrative remedies as are available" before filing suit under section 1983 "or any other Federal law." See Porter v. Nussle, 534 U.S. 516, 532 (2002). It would appear that Christoforo did not comply with the exhaustion requirement. The exhaustion requirement, however, is an affirmative defense which defendants have failed to raise. See Casanova v. Dubois, 304 F.3d 75, 77 n.3 (1st Cir. 2002).

On December 22, 2002, Christoforo asked to be transferred from kitchen duty. He was told that the only job available was cleaning trash barrels and toilets. Eager to escape from Lupo, Christoforo accepted. On December 23, 2002, the day he was to begin the new assignment, Lupo ordered Christoforo to return temporarily to the food assembly line. Lupo claims that when Christoforo did so, he became disruptive and boisterous. When Christoforo allegedly disobeyed an order to stop talking, Lupo boxed Christoforo on the ear. Robert Smith, another inmate, testified that he was the one talking loudly, that Lupo became upset and directed a racial slur at him, told him to shut up, and then inexplicably punched Christoforo. "It was like he came up from behind [Christoforo], and he leaned back so it was like, Christoforo thinks he's gone but he's not, he's behind him and (demonstrating) smacks him in the ear. . . . And I'm just breathless standing there watching this. I didn't think he was gonna hit him. . . . I mean, he's calling me this name. I thought he was gonna hit me." Sordillo also witnessed the incident and stated that Lupo "whacked [Christoforo] in the ear, punched him in the ear."

Christoforo requested permission to go to the infirmary. He complained of dizziness and vomiting. The nurse reported Christoforo as pale, with an unsteady gait and complaining of a ringing sensation in his ear. His vital signs, however, were normal. The nurse also observed a small lump on Christoforo's head and ear. Christoforo returned to the infirmary each of the next two days complaining of flu-like symptoms, nasal blockages, a "lightening rod feeling up into my brain," throbbing in his ear, and nausea.

Over the next two years, Christoforo was seen at Lemuel Shattuck Hospital and then at the New England Eye Center at the Tufts University School of Medicine.

Christoforo complained of hearing loss, vertigo, headaches, and facial spasms. He was eventually diagnosed with open angle glaucoma with mild optic neuropathy and mild hemifacial spasm. While the diagnosing doctor was of the opinion that both conditions could have been caused by trauma to the head, the onset of Christoforo's symptoms did not appear to be temporally related to the December 23, 2002 incident.

The Sheriff conducted an investigation of the assault. On January 14, 2003, Sheriff Cousins sent Lupo a letter summarizing the findings.

> The Internal Affairs Investigators concluded that there was evidence, based on medical reports and statements by witnesses, to conclude that Officer Lupo did strike/assault an inmate. Your conduct was clearly unbecoming an officer in this Department. As a public servant and sworn officer of the Commonwealth, you are duty-bound to maintain the high standards of care and custody of the inmates under your control. Without restating details of the incident in question, I have concluded that your conduct was in violation of Department rules and regulations governing personal conduct in the workplace and while interacting with inmates under your supervision.
>
> There is sufficient reason to believe that Officer Lupo was verbally abusive and uttered racial slurs when addressing an inmate. Officer Lupo's alleged actions are considered a serious dereliction of duty that brings into question his ability to function effectively as a senior officer and leader in this Department. It also sets a poor example for those under his supervision.

Lupo was suspended for five days without pay and ordered to successfully complete anger management counseling. Lupo refused to attend the anger management classes and eventually resigned from the Jail staff.

## DISCUSSION

Lupo argues that his conduct is not actionable because he applied no more force than necessary to maintain control of a potentially explosive situation. "Where a prison security measure is undertaken to resolve a disturbance . . . we think the question whether

the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley v. Albers, 475 U.S. 312, 320-321 (1986).  Even by Lupo's description, loud talk in a chow line would hardly qualify as a prison "disturbance."  (Whitley involved the use of deadly force to rescue a guard who had been taken hostage by rioting inmates).  Given the deposition testimony and the Sheriff's own conclusions about the punching incident, Christoforo has amassed sufficient evidence to raise a dispute of fact as to whether Lupo's use of force was justified.

Lupo argues in the alternative that any injury Christoforo suffered was *de minimus* and thus outside the pale of the Eighth Amendment.  Lupo points to the statement in Hudson v. McMillian, 503 U.S. 1, 9-10 (1992), that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimus* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" But Hudson also explained that "[t]he objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.' . . . 'In the excessive force context, society's expectations are different [than they are with respect to claims of indifference to medical needs or conditions of confinement].  When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Id. at 9.

The court cannot say as a matter of law that Lupo's attack on Christoforo resulted in a truly *de minimus* injury.  From all appearances, Lupo's ragging of Christoforo was

5

based on a twisted sense of sexual gratification. A finder of fact could reasonably conclude that the punch to Christoforo's ear was motivated by resentment at Christoforo's request for a transfer rather than a concern for institutional order. The blow resulted in a visible bump on Christoforo's head and ear, temporary dizziness, vomiting, and tinnitus. Whether Christoforo can establish any permanent injury attributable to the attack goes to the issue of damages and not liability. See Brooks v. Kyler, 204 F.3d 102, 108 (3d Cir. 2000) ("As we read the [Hudson] opinion, the Supreme Court is committed to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual *force* that results in sufficient *injury*."). Consequently, Lupo's motion for summary judgment will be DENIED.

Sheriff Cousins' arguments are more viable. Cousins contends that to the extent he has been sued in his individual capacity the claim fails for want of proof.[3] A supervisor cannot be held vicariously liable on a theory of *respondent superior*. He can be found "liable only on the basis of [his] own acts or omissions." Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir. 1989). This, at a minimum, requires a showing that the supervisor implemented an unconstitutional policy, action or practice causing constitutional injury or that he displayed deliberate or callous indifference to constitutional misconduct on the part of his subordinates. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-582 (1st

---

[3]Cousins argues persuasively that to the extent the Complaint seeks to name him in his official capacity, the claim for damages is one against the Commonwealth and is therefore precluded by the Eleventh Amendment's Sovereign Immunity Clause. See Will v. Michigan Department of State Police, 491 U.S. 58, 65-67 (1989); Lopes v. Commonwealth, 442 Mass. 170, 175 (2004). Christoforo does not seek injunctive relief.

Cir. 1994). In this context, "[t]o demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

It is undisputed that Christoforo never formally protested Lupo's harassment. To the extent that he complained about Lupo to deputy Legalt, he admits that he provided no substantive details, nor gave any indication that he was in physical fear.[4] Nor is there any indication that Lupo had engaged in a pattern of assaults on inmates. Consequently, there is nothing in the record from which a finder of fact could conclude that Cousins knew or should have known that Lupo posed a risk of harm to Christoforo.[5]

Christoforo also alleges that Cousins failed to properly train Lupo for work in a prison environment. (Lupo did not receive formal training at ECHC until after a year on the job). To prevail on a failure-to-train claim, a plaintiff must show that a specific deficiency in a training program (or a lack of training) was the "moving force" in causing a constitutional injury. City of Canton v. Harris, 489 U.S. 378, 387, 388 (1989). See Colburn v. Upper Darby Township, 946 F.2d 1017, 1030 (3d Cir. 1991) (plaintiff failed to

---

[4]Christoforo, in his deposition testimony, stated that he told another prison guard, Paul Wolzack, about Lupo's conduct when the night before the incident he requested a job transfer. Even if Christoforo was more forthcoming with Wolzack than he was with Legalt, the Sheriff could not be expected to respond to the complaint on less than 24 hours notice (assuming actual or constructive knowledge of the complaint on the part of the Sheriff).

[5]Absent knowledge of a pattern of conduct on Lupo's part directed either at Christoforo or other inmates, Sheriff Cousins cannot reasonably be held accountable for an isolated instance of misconduct by a subordinate. See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 93-94 (1st Cir. 1994).

identify specific training that could reasonably have been expected to prevent a detainee's suicide). Christoforo has failed to meet his burden in this regard. No amount of "training" could be expected to avert a random and gratuitous act of violence.[6]

## ORDER

For the foregoing reasons, Lupo's motion for summary judgment is <u>DENIED</u>. Cousins' motion for summary judgment is <u>ALLOWED</u>.

                SO ORDERED.

                /s/ Richard G. Stearns

                _____
                UNITED STATES DISTRICT JUDGE

---

[6]The case might be different with respect to sustained sexual harassment, which might be pervious to corrective education. Christoforo, however, complains of the use of excessive force by Lupo. He does not argue that Lupo's harassment amounted to a condition of confinement so unduly harsh as to violate the Eighth Amendment. <u>Cf.</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).